# EXHIBIT 1

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
------------------------------------------------------------X
In re COMVERSE TECHNOLOGY, INC.

Derivative Litigation.                                     **MEMORANDUM & ORDER**

------------------------------------------------------------X         06-CV-1849 (NGG) (RER)
This Document Relates To:

ALL ACTIONS.
------------------------------------------------------------X

**RAMON E. REYES, JR., United States Magistrate Judge:**

Before the Court are three competing motions for the appointment of lead plaintiff and lead counsel in this consolidated shareholder derivative action. Plaintiff Frank Capovilla ("Capovilla") has moved to be appointed lead plaintiff and to have his attorneys, the Law Offices of Thomas G. Amon and the law firm Robbins Umeda & Fink, LLP ("Amon/Robbins"), appointed as co-lead counsel. Plaintiff Louisiana Municipal Police Employees' Retirement System ("LMPERS") has moved to be appointed as lead plaintiff, and for its counsel, the law firm Bernstein Litowitz Berger & Grossmann LLP ("Bernstein Litowitz"), to be appointed as lead counsel. Plaintiffs Noam Sokolow ("Sokolow"), Bruce Braverman ("Braverman"), and Charles G. Cooper, *et al.* (collectively, the "Cooper Group") have moved to have their attorneys, the law firms Wolf Haldenstein Adler Freeman & Herz LLP and Abraham Fruchter & Twersky LLP ("Wolf Haldenstein/Abraham Fruchter") appointed as co-lead counsel. The Cooper Group also seeks to have Charles G. Cooper appointed as lead plaintiff. For the reasons which follow, the Court declines to appoint a "lead" plaintiff, but appoints Bernstein Litowitz to serve as lead counsel. Other aspects of the order setting forth the leadership structure follow as well.

DISCUSSION

The appointment of lead plaintiff and lead counsel in a consolidated shareholder derivative litigation is a matter of discretion. *MacAlister v. Guterma*, 263 F.2d 65, 68 (2d Cir. 1958); 9 Wright & Miller, Fed. Prac. & Proc.: Civil 2d § 2385 at 463 (1995).[1]

I. Appointment of Lead Plaintiff

There is no statutory authority, such as the Private Securities Litigation Reform Act of 1995 ("PSLRA"), Pub. L. 104-67, 109 Stat. 737 (1995), which *requires* the Court to appoint a lead plaintiff in a shareholder derivative action. *In re Doral Fin. Corp. Sec. Litig.*, No. 05-MDL-1706, 2006 WL 1120491, *1 (S.D.N.Y. Apr. 27, 2006) (citing *MacAlister*, 263 F.2d at 68-69)). Rather, derivative actions must comply with Rule 23.1 of the Federal Rules of Civil Procedure, which requires only that a plaintiff in a derivative action "fairly and adequately represent the interests of the shareholders or members similarly situated in enforcing the right of the corporation or association." Fed. R. Civ. P. 23.1. While Rule 23.1 does not make reference to the appointment of a "lead" plaintiff, presumably because plaintiffs in derivative action are bringing claims on behalf of a company, the Advisory Committee Notes make clear that in a derivative action "[t]he court has the inherent power to provide for the conduct of the proceedings. . . ." Advisory Committee Note to Rule 23.1. While the Rule may contemplate the appointment of a lead plaintiff, the Court is not aware of any precedent requiring as such. Indeed, many courts in this district and others have consolidated derivative actions, appointed lead counsel, but have not appointed a lead plaintiff. *See, e.g., In re DHB Industries, Inc.*

---

[1] A district court reviews a magistrate judge's determination of whom to appoint as lead plaintiff or lead counsel, which is a "nondispositive" matter, under the clearly erroneous standard. 28 U.S.C. § 636(b)(1)(A); Fed. R. Civ. P. 72(a).

2

*Derivative Litig*, No. 05-CV-4345 (E.D.N.Y.) (Jan. 31, 2006 Order adopting Report and Recommendation dated Jan. 1, 2006) (consolidating derivative actions and appointing lead counsel without appointing lead plaintiff); *Computer Assocs. Int'l, Inc. Derivative Litigation*, No. 04-CV-2697 (E.D.N.Y. Oct. 19, 2004) (same); *In re NBTY, Inc. Derivative Litig.*, No. 04-CV-2876 (E.D.N.Y. Nov. 4, 2004) (same); *Scalisi v. Fund Asset Mgmt, L.P.*, No. 02-CV-5592 (E.D.N.Y. Jan. 31, 2003) (same); *see also Bernstein v. Presidential Life Corp.*, No. 92 Civ. 6968 (VLB), 1993 WL 43559 (S.D.N.Y. Feb. 10, 1993) (same).

Further, in expounding on the benefits of consolidation of derivative actions in the seminal case of *MacAlister v. Guterma*, the Second Circuit never once mentions the benefits of appointing a lead plaintiff. 263 F.2d at 68. Rather, the court notes that "[a]n order consolidating such [derivative actions] during the pre-trial stages, *together with the appointment of a general counsel*, may in many instances prove the only effective means of channeling the efforts of counsel. . . ." *Id.* (emphasis added). The court notes further that the "benefits achieved by consolidation *and the appointment of general counsel, i.e.*, elimination of duplication and repetition and in effect the creation of a coordinator of diffuse plaintiffs through whom motions and discovery proceedings will be channeled, will most certainly redound to the benefit of all parties to the litigation." *Id.* at 69 (emphasis added). Moreover, as the Second Circuit has pointed out, a derivative action "consists of only one claim– the corporate claim against the alleged wrongdoers. . . the plaintiff stockholder in a derivative suit is seeking to enforce, for the benefit of the corporation, a corporate claim which the corporation, for whatever reason, is unwilling to prosecute." *Papilsky v. Berndt*, 466 F.2d 251, 255-56 (2d Cir. 1972). Thus, the

3

nature of a derivative action and the benefits of consolidation are not necessarily enhanced by the appointment of a lead plaintiff.

Finally, as a practical matter, the appointment of a "lead" plaintiff is unnecessary. As I am inclined to appoint lead counsel in this consolidated, complex derivative litigation, and as each of the proposed lead counsel have a client, or multiple clients, there really is no need to appoint a "lead" plaintiff. Each proposed lead plaintiff has amply demonstrated that they can "fairly and adequately represent the interests of the shareholders . . . in enforcing the right of the corporation . . ." Fed. R. Civ. P. 23.1. Further, and more importantly, each of the prosed lead plaintiffs have demonstrated that, without seeking any compensation, they will "vigorously litigate" this action. Therefore, whomever is selected as lead counsel will benefit from the assistance of an otherwise "adequately representative" client that is dedicated to the vigorous prosecution of this action. Moreover, I do not believe that any of the plaintiffs will shy away from the vigorous prosecution of the action just because they have not been appointed as "lead" plaintiff. Accordingly, I find that the appointment of lead plaintiff in this consolidated derivative action is unnecessary, and I will exercise my discretion and not appoint a lead plaintiff.[2]

---

[2] Each of the parties argue strenuously that they are a more "adequate representative" and will more "vigorously litigate" this case than the others. The Court rejects all of the plaintiffs' arguments. As is clear from the motion papers, each of the plaintiffs will "fairly and adequately represent the interests of the shareholders," which is all Rule 23.1 requires. While each of the proposed lead plaintiffs are subject to potential attack by the defendants as not being an "adequate representative," the Court cannot, on this record, predict which plaintiff is most subject to attack, or quantify which plaintiff is the most "adequate representative" of the interest of the shareholders.

4

II.     Appointment of Lead Counsel

As with the appointment of a lead plaintiff, there is also no statutory authority setting forth the criteria a court must apply in appointing lead counsel in a consolidated shareholder derivative suit.[3] The proposed lead plaintiffs have each suggested slightly different criteria, with support from case law, which I should apply to resolve this issue. Capovilla suggests that I focus my attention on who filed the first action,[4] while also considering: (1) the quality of the pleadings; (2) the vigorousness of the prosecution of the lawsuits; and (3) the capabilities of counsel. Sokolow, Braverman, and the Cooper Group argue that I should utilize the criteria set forth in Rule 23(g) of the Federal Rules of Civil Procedure, and consider: (1) the work counsel has done in identifying or investigating potential claims in the action; (2) counsel's experience in handling class actions, other complex litigation, and claims of the type asserted in the action; (3) counsel's knowledge of the applicable laws; (4) the resources counsel will commit to representing the class; and (5) any other matter pertinent to counsel's ability to fairly represent the interests of the class. *See* Fed. R. Civ. P. 23(g)(1)(C). LMPERS argues that, all things being equal, I should look to the PSLRA's standards for appointment of lead plaintiffs, and select the counsel representing the plaintiff with the largest financial interest.[5]

---

[3] There is also no controlling case law setting forth such criteria either, thus leaving the criteria to be applied to the discretion of the Court.

[4] Capovilla filed his action on April 20, 2006. Sokolow and Braverman filed their complaints on May 1, 2006. LMPERS filed its complaint on June 8, 2006. The Cooper Group filed its complaint on June 23, 2006.

[5] In its moving papers, LMPERS claimed to be the plaintiff with the largest financial interest. After LMPERS filed its moving papers, however, the Cooper Group filed a complaint and a joinder to the motion of Sokolow and Braverman, and alleged that its financial interest surpassed that of LMPERS.

5

In light of the fact that I have decided not to appoint a lead plaintiff, the factors suggested by Capovilla, Sokolow, Braverman and the Cooper Group are the most appropriate to apply to the question of which law firm(s) should be appointed as lead counsel.[6] Those factors all focus on the capabilities of counsel to effectively litigate a shareholder derivative case such as this. While it is a close call, the application of those factors indicate to me that Bernstein Litowitz should be appointed as lead counsel to litigate this shareholder derivative case.

At the outset, I find that each counsel has demonstrated that they are capable of serving as lead counsel. Each firm is well-respected in the legal community, and moreover is experienced in prosecuting shareholder derivative cases and private securities class actions. To the extent that each firm argues that it is more experienced than the others, I find it impossible to quantify with any certainty which firm is the most experienced. Clearly, each firm has been responsible for huge recoveries in shareholder derivative cases and securities class actions, thus indicating that they are knowledgeable about the applicable law, and have the experience and capability to effectively litigate such actions. No firm, however, has suggested a definitive template with which to measure experience and effectiveness, and moreover it is difficult to contemplate one.

---

[6] I reject LMPERS argument that the PSLRA's largest financial interest standard should be applied here, especially in light of the fact that I have exercised my discretion to not appoint a lead plaintiff. In light of the critical difference between PSLRA and derivative cases – the former is brought on behalf of the shareholders themselves, and the latter is brought on behalf of the corporation – the PSLRA is simply not an adequate template from which to determine whom should be appointed lead counsel in a shareholder derivative case. *See generally DiRienzo v. Philip Servs. Corp.*, 232 F.3d 49, 61-62 (2d Cir. 2000) (in forum non conveniens context, recognizing differences between PSLRA and shareholder derivative cases); *see also* 7C Wright & Miller, Fed. Prac. & Proc.: Civil 2d § 1833 at 141 (1986) ("Because the derivative suit is brought to enforce the right of the corporation and the stockholders will benefit only indirectly, . . . the dollar amount . . . involved should not be relevant."). Nevertheless, as I explain below, LMPERS's counsel should be appointed to lead this derivative litigation.

6

Should I measure the experience and effectiveness of counsel by the number of cases handled successfully, the total recovery in such cases, or perhaps some other measure? Such measures are not capable of precise comparison, and therefore they are not particularly useful in answering the question at issue.

Capovilla, Sokolow, Braverman and the Cooper Group all argue that their respective counsel can commit more resources to litigating this case than can each other and LMPERS's counsel, relying principally upon the fact their chosen firms have affiliated themselves with other counsel experienced in corporate law and governance. I find these arguments unpersuasive. First, where all parties are represented by experienced attorneys from reputable law firms with extensive and proven track records in derivative and securities cases, it is extremely difficult to determine with any degree of certainty which firm will bring more to the table. Second, given each firm's track record of successfully litigating complex shareholder derivative cases and securities class actions, it is abundantly clear that they each can and will commit the resources necessary to effectively litigate this particular derivative action.[7]

Rather than focus on factors that are difficult to quantify with precision, or factors that at best indicate a draw, I will instead focus the inquiry on the quality of the pleadings to determine the work counsel and their respective clients have done thus far in investigating and identifying potential claims in this action. On the whole, each plaintiff has filed a detailed and professional

---

[7] It is also clear to me, as discussed above, that each proposed lead counsel will vigorously prosecute this action with the assistance of an adequately representative client. Thus, the second factor proposed by Capovilla is a wash. If, however, at a later date any plaintiff can demonstrate that the selected lead counsel is not vigorously prosecuting this action, or has otherwise failed to live up to the responsibilities of lead counsel, the Court can review its decision at that time.

7

complaint. Nevertheless, I find that LMPERS's complaint is more comprehensive, albeit slightly, than the others in one significant regard, thus tipping the scale in favor of appointing Bernstein Litowitz as lead counsel.[8]

LMPERS's complaint includes more comprehensive allegations concerning the length of the improper stock option backdating scheme than do the other complaints. For example, LMRERS's complaint alleges an unlawful stock option backdating scheme dating from 1994 through at least 2005, describing in detail each of the purportedly improper option grants at issue. *See* LMPERS's Verified Derivative Complaint, No. 06-CV-2983, ¶¶ 2, 76-88, 99-111. In contrast, the other complaints allege improper backdating of stock options only from 2001 to 2005, possibly tracking Comverse's April 17, 2006 statement that it would restate its financial results for fiscal years 2001 through 2005 due to the backdating of stock options during that period. *See* Capovilla Verified Derivative Complaint, No. 06-CV-1849, ¶¶ 1, 36-91; Sokolow's Verified Derivative Complaint, No. 06-CV-2015, ¶¶ 2, 63-106; Braverman's Verified Derivative Complaint, No. 06-CV-2017, ¶¶ 4, 31-61; Cooper Group's Verified Derivative Complaint, No. 06-CV-3138, ¶¶ 2, 65-103. Thus, all of the pleadings other than LMPERS fail to capture possibly improper stock option backdating for more than seven years, thus potentially limiting the recovery on behalf of Comverse. *See* LMPERS's Compl. at ¶¶ 76, 79-85. At this point in the litigation, however, there is no reason to limit the period of potential recovery to coincide with the period which Comverse believes it may have to restate its earnings. The breadth of the allegations in LMPERS's complaint in terms of the relevant period indicates to me that LMPERS

---

[8] For this reason I reject Capovilla's first-filed argument as well. Contrary to Capovilla's argument, all things are not quite "equal."

8

and Bernstein Litowitz have done more to investigate the factual predicates of this derivative action, and to press for the most extensive recovery period, thus setting them apart from their colleagues.

Finally, all of the plaintiffs criticize each other's pleadings for various other purported deficiencies, *e.g.*, not raising certain substantive claims, or for using words and phrases that may subject the pleadings to heightened scrutiny.[9] I have considered each criticism and find that they are immaterial to the Court's determination of who should be appointed lead counsel. At best the purported deficiencies show that each counsel views the case differently or has made tactical decisions on the best course for litigation. At worst, the criticisms show that *each* counsel has made mistakes in drafting their pleadings, thus amounting to nothing more than a wash. Nevertheless, and more importantly, none of the purported deficiencies in LMPERS's complaint are fatal, and can be cured when LMPERS files a consolidated derivative complaint.

Accordingly, the Court hereby appoints Bernstein Litowitz as lead counsel. Other aspects of the Order Setting Forth the Leadership Structure follow.

---

[9] Capovilla criticizes Sokolow, Braverman and the Cooper Group for not alleging diversity jurisdiction, and for copying portions of Capovilla's complaint verbatim. Capovilla also criticizes LMPERS for using words and phrases such as "scheme" and "knowingly and fraudulently" throughout its complaint, and thus potentially subjecting LMPERS complaint to Fed. R. Civ. P. 9(b)'s heightened pleading standard. Sokolow, Braverman and the Cooper Group criticize Capovilla and LMPERS for not alleging a claim pursuant to Section 14(a) of the Securities Exchange Act of 1934, 15 U.S.C. § 78n(a), and criticize Capovilla for failing to name as defendants all of the current members of Comverse's Board of Directors. LMPERS criticizes all other parties for failing to allege: (1) that the shares of stock underlying the improper backdating were not duly authorized and validly issued, and therefore should be cancelled; and (2) a violation of the Foreign Corrupt Practices Act, 15 U.S.C. § 78dd, *et seq.*

III. ORDER SETTING FORTH THE LEADERSHIP STRUCTURE:

    A. <u>Lead Counsel</u>

        1. The law firm of Bernstein Litowitz Berger & Grossmann LLP is hereby appointed Lead Counsel.

        2. Lead Counsel shall assume and exercise the full authority to litigate this action on behalf of all derivative plaintiffs, including the following powers and responsibilities:

            a. To coordinate the briefing and argument of motions;

            b. To coordinate the conduct of written discovery proceedings;

            c. To coordinate the examination of witnesses in depositions;

            d. To coordinate the selection of counsel to act as spokesperson at pretrial conferences and all other court proceedings;

            e. To call meetings of plaintiffs' counsel as they deem necessary and appropriate from time to time;

            f. To conduct all settlement negotiations with counsel for the defendants;

            g. To coordinate and direct the preparation for trial, and the trial of this matter and to delegate work responsibilities to selected counsel as may be required;

            h. To receive orders, notices, correspondence and telephone calls from the Court on behalf of all plaintiffs, and to transmit copies of such communications to plaintiffs' counsel; and

            I. To supervise any other matters concerning the prosecution or resolution of the Derivative Litigation.

3. With respect to scheduling and/or procedural matters, defendants' counsel may rely upon all agreements with Lead Counsel.

4. No pleadings or other papers shall be filed, or discovery conducted by any plaintiff except as directed or undertaken by Lead Counsel. Nothing herein shall prohibit plaintiffs, however, from challenging the selection of Lead Counsel at a later point in this litigation.

5. Service by the defendants on plaintiffs of any papers shall be deemed to be complete for all purposes when a copy is served on Lead Counsel.

B. Newly-Filed or Transferred Actions

1. This Court requests the assistance of counsel in calling to the attention to the Clerk of the Court the filing or transfer of any case that might properly be consolidated as port of the Derivative Litigation.

2. When another shareholder derivative action that arises out of the same subject matter of the Derivative Litigation is hereinafter filed in this Court or transferred from another court, the Clerk of this Court shall:

a. File a copy of this Memorandum and Order in the separate file for such action;

b. Mail or email a copy of this Memorandum and Order to the attorneys for the plaintiff(s) in the newly-filed or transferred case and to any new defendant9s) in the newly-filed or transferred case; and

c. Make an appropriate entry in the Lead Case for the Derivative Litigation.

11

3. Each newly-filed or transferred shareholder derivative action that arises out of the subject matter of the Derivative Litigation shall be consolidated with the Derivative Litigation and this Memorandum and Order shall apply thereto, unless a party objects to the consolidation or any provision of this Memorandum and Order within 10 days after the date upon which a copy hereof is served on counsel for such party, and this Court deems it appropriate to grant such application. Nothing in the foregoing shall be construed as a waiver of the defendants' right to object to consolidation of any subsequently-filed or transferred related action.

C. Consolidated Complaint

Plaintiffs will have thirty (30) days from the date of this Memorandum and Order in which to file a consolidated complaint or designate one of the pending complaints as the operative complaint. Defendants shall have forty-five (45) days thereafter in which to answer, move to dismiss, or otherwise respond to such complaint.

**SO ORDERED**

Dated: Brooklyn, New York
September 22, 2006

/s/
RAMON E. REYES, JR.
United States Magistrate Judge

12