# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

|  |  |  |
|---|---|---|
| BONNIE MITCHELL and MICHAEL FRIEDMAN, derivatively on behalf of BROADWIND ENERGY, INC., | ) ) ) ) | |
| Plaintiffs, | ) | Case No. 11-cv-01059 |
| v. | ) | Judge Robert W. Gettleman |
| | ) | |
| J. CAMERON DRECOLL, *et al.*, | ) | |
| | ) | |
| Defendants, | ) | |
| and | ) | |
| | ) | |
| BROADWIND ENERGY, INC., | ) | |
| | ) | |
| Nominal Defendant | ) | |

**MEMORANDUM OF DEFENDANTS DAVID P. REILAND, JAMES M. LINDSTROM, CHARLES H. BEYNON, WILLIAM T. FEJES, JR. AND TERENCE P. FOX IN SUPPORT OF MOTION TO DISMISS CONSOLIDATED DERIVATIVE COMPLAINT**

John M. George, Jr.
Jeffrey R. Tone
Katten & Temple LLP
542 S. Dearborn, Suite 1060
Chicago, IL 60605
(312) 663-0800
jgeorge@kattentemple.com
jtone@kattentemple.com

Attorneys for David P. Reiland, James M. Lindstrom, Charles H. Beynon, William T. Fejes, Jr. and Terence P. Fox

# TABLE OF CONTENTS

TABLE OF CONTENTS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  **i**

TABLE OF AUTHORITIES . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **ii**

INTRODUCTION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **1**

FACTUAL BACKGROUND . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **3**

ARGUMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **7**

**I.**     **COUNT I DOES NOT STATE A CLAIM FOR BREACH OF FIDUCIARY
        DUTY AGAINST THE OUTSIDE DIRECTORS** . . . . . . . . . . . . . . . . . **7**

    **A.**     **Plaintiffs Have Not Adequately Pleaded A Violation Of The Business
            Judgment Rule** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **7**

        **1.**     **Tontine Had A Contractual Right To Have Its Shares Sold
                In An Underwritten Offering** . . . . . . . . . . . . . . . . . . **8**

        **2.**     **The Offering Was Clearly In Broadwind's Best Interests** . . . . **9**

    **B.**     **The "Entire Fairness" Doctrine Is Not Applicable Here** . . . . . . . . **11**

**II.**    **COUNT II DOES NOT STATE A CLAIM FOR WASTE OF CORPORATE
        ASSETS** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **13**

**III.**   **COUNT III SOUNDS IN FRAUD AND DOES NOT SATISFY THE
        PLEADING   REQUIREMENTS OF RULE 8 OR RULE 9(b)** . . . . . . . . . **15**

    **A.**     **Count III Does Not State A Plausible Claim For Relief** . . . . . . . . . **15**

    **B.**     **Count III Does Not Supply The Particularity Required By Rule 9(b)** . . **17**

**CONCLUSION** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **20**

## TABLE OF AUTHORITIES

**Cases**

*Ackerman v. Northwestern Mut. Life Ins. Co.,* 172 F.3d 467 (7th Cir.1999) ............................... 18

*Aronson v. Lewis*, 473 A.2d 805 (Del. 1984)................................................................... 8, 11, 12

*Beam ex rel. Martha Stewart Living Omnimedia, Inc. v. Stewart*, 845 A.2d 1040 (Del. 2004)..... 8

*Bell Atlantic Corp. v. Twombly*, 550 U.S. 544 (2007)................................................... 2, 7, 11, 17

*Borsellino v. Goldman Sachs Group, Inc.*, 477 F.3d 502 (7th Cir. 2007). .............................. 7, 17

*Brehm v. Eisner*, 746 A.2d 244 (Del. 2000) ............................................................... 8, 13

*Cantor Fitzgerald, L.P. v. Cantor,* 724 A.2d 571 (De. Ch.1998)................................................. 16

*Cede & Co. v. Technicolor, Inc.,* 634 A.2d 345 (Del. 1993) ...................................................... 11

*Citron v. Fairchild Camera and Instrument Corp.*, 569 A.2d 53 (Del. 1989) ............................ 12

*DiLeo v Ernst & Young*, 901 F.2d 624 (7th Cir. 1990)......................................................... 18, 19

*EEOC v. Concentra Health Services*, 496 F.3d 773 (7th Cir. 2007) ............................................ 7

*Goren v. New Vision Int'l, Inc.,* 156 F.3d 721 (7th Cir.1998)..................................................... 18

*Guttman v. Huang*, 823 A.2d 492, 502 (Del. Ch. 2003)...................................................... 13, 18

*Hokanson v. Petty*, 2008 WL 5169633 (Del. Ch., December 10, 2008)........................................ 9

*Holzgrafe v. Hinsdale Bank & Trust Co.*, 2009 WL 3824651 (N.D. Ill., Nov.13, 2009).............. 7

*In re Citigroup Inc. S'holder Deriv. Litig.*, 964 A.2d 106 (Del. Ch. 2009)................................. 19

*In re Walt Disney Co. Deriv. Litig.*, 906 A.2d 27 (Del. 2005), .............................................. 13, 14

*In re Dow Chem. Deriv. Litig.*, 2010 WL 66769 (Del. Ch. Jan. 11, 2010)................................... 12

*In re Primedia Inc. Derivative Litigation*, 910 A.2d 248 (Del. Ch. 2006). .................................. 10

*Lachmund v. ADM Investor Services, Inc.*, 191 F.3d 777 (7th Cir. 1999).................................... 17

*Oakland County Employees' Retirement System v. Massaro*, 736 F. Supp. 2d 1181 (N.D Ill. 2010) ................................................................................................................................ 16, 17

*Orman v. Cullman,* 794 A.2d 5 (Del. Ch. 2002).......................................................................... 11

*Riggs Partners, LLC v. Hub Group, Inc.*, 2002 WL 31415721(N.D. Ill. Oct. 25, 2002). .............. 3

*Schaufenbuel v. InvestForClosures Financial LLC*, No. 09 C 1221, 2009 WL 3188222 (N.D. Ill Sept. 30, 2009) ..................................................................................................................... 17

*Venture Assoc. Corp. v. Zenith Data Sys. Corp.*, 987 F.2d 429 (7th Cir. 1993 ............................. 3

**Rules**

Fed. R. Civ. P. 8............................................................................................................................ 2

Fed. R. Civ. P. 9(b) ...................................................................................................................... 7

Defendants David P. Reiland, James M. Lindstrom, Charles H. Beynon, William T. Fejes, Jr., and Terence P. Fox (collectively "the Outside Directors") respectfully submit the following memorandum in support of their motion to dismiss the Consolidated Derivative Complaint ("Complaint") pursuant to Fed. R. Civ. P. 12(b)(6).

## INTRODUCTION

Plaintiffs claim that the Outside Directors breached their fiduciary duties to Broadwind Energy ("Broadwind") by approving a secondary offering of stock ("the Offering"), in which Broadwind, its principal shareholder, Tontine, and its CEO, J. Cameron Drecoll, sold a total of 17,250,000 shares. Plaintiffs allege that the Offering benefitted only Tontine and Drecoll and was not in Broadwind's "best interests," and that the Outside Directors therefore should have stopped it. The Complaint itself, as well as the Prospectus on which the Offering was based, demonstrate that plaintiffs' allegations are simply not true. Although the Complaint takes a stab at a variety of different legal theories, the Court need only focus on three central, uncontroverted facts in order to dispose of plaintiffs' putative claims against the Outside Directors.

First, the Outside Directors did not themselves benefit in any way from the Offering, and plaintiffs do not allege to the contrary. The Outside Directors did not sell stock either in the Offering or at the same time. Nor does the Complaint allege that they received anything from Tontine in connection with the Offering. Indeed, with one exception, plaintiffs do not even allege that the Outside Directors had any interest whatsoever in Tontine.

Second, the corporation to which the Outside Directors owed a duty of loyalty – Broadwind – indisputably received a substantial benefit from the Offering in the form of $53.9 million in badly-needed capital. In fact, that infusion was so critical that the Prospectus warned that Broadwind might not survive if the Offering did not go forward.

Third, Tontine, the selling shareholder, had a binding contract with Broadwind that pre-dated the Offering by nearly three years and that gave Tontine an absolute *right* to sell its shares in any underwritten sale of securities, including the Offering. Thus, the Outside Directors could have prevented Tontine from selling its shares only by causing Broadwind to breach its contract with Tontine.

In the face of those uncontested facts, each of the three claims that plaintiffs seek to assert against the Outside Directors are doomed, and none of them state a plausible claim for relief under Fed. R. Civ. P. 8 and *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555 (2007). Plaintiffs cannot seriously contend that the Outside Directors breached fiduciary duties of loyalty and good faith (Count I) by approving an Offering that the Company needed in order to survive, that the selling shareholder had an absolute right to participate in, and which did not benefit the Outside Directors in any way. Moreover, plaintiffs cannot salvage that claim by changing the breach of fiduciary duty claim from a "business judgment" case to an "entire fairness" case in which the burden of fairness would be on the Outside Directors. This case does not remotely fit the parameters of the "entire fairness" doctrine – under which directors are not entitled to the protections of the business judgment rule if they are on "both sides" of the transaction at issue. Not only did the Outside Directors not benefit personally from the Offering, *everyone here* – Broadwind, Tontine, and the Outside Directors – was on the *same side* of the transaction (with the purchasers of the Broadwind stock on the other side). Moreover, Broadwind and Tontine benefitted equally, with neither gaining at the expense of the other.

Furthermore, given how crucial the Offering was to Broadwind's survival, plaintiffs cannot argue that the Offering constituted a "waste of corporate assets" (Count II). Because plaintiffs cannot seriously challenge the Offering itself, they are reduced to arguing that the

defendants should not have gone forward with it because of the expenses that Broadwind incurred. The contention that it was a waste of corporate assets to incur $725,000 in costs in order to receive $53.9 million in capital is absurd.

Finally, plaintiffs argue that the Outside Directors had "inside information" and that *they* traded on it – "through Tontine" (Count III.) Although the basis of this claim is unclear (given that the Outside Directors did not trade themselves and cannot in any sense be said to be trading "through Tontine"), what is clear is that the claim sounds in fraud, Rule 9(b)'s particularity requirements are applicable to it, and plaintiffs utterly fail to plead fraud with particularity. Plaintiffs fail to plead what "knowledge" each of the Outside Directors had, when they had it, what should have been disclosed, and how that knowledge gives rise to a claim that the Outside Directors somehow benefitted from the fraud. The Complaint should be dismissed as to the Outside Directors in its entirety with prejudice.

## FACTUAL BACKGROUND

The Outside Directors incorporate by reference the Background discussion in the Memorandum of nominal defendant Broadwind ("Broadwind Memo."), and the Outside Directors set forth here only the facts particularly relevant to their motion. At the heart of this case is the January 21, 2010 public offering of Broadwind stock in which Broadwind, Tontine, and Drecoll sold 17,250,000 shares at $5.75 per share. *See* January 14, 2010 Prospectus ("Prospectus"), attached as Exhibit B to Broadwind Memo.[1] Pursuant to a Securities Purchase Agreement between Broadwind and Tontine, Tontine was entitled to nominate up to three directors to Broadwind's Board. (Compl. ¶ 65.) Defendants Charles Beynon, William T. Fejes,

---

[1] The Court may consider the Prospectus on this motion to dismiss, as it is referenced in plaintiffs' Complaint and is central to their claims. *Venture Assoc. Corp. v. Zenith Data Sys. Corp.*, 987 F.2d 429, 431 (7th Cir. 1993); *Riggs Partners, LLC v. Hub Group, Inc.*, 2002 WL 31415721, at *1 (N.D. Ill. Oct. 25, 2002).

3

and James M. Lindstrom were the Outside Directors nominated by Tontine. Of those three, James Lindstrom was employed by an affiliate of Tontine, and the other two had no such relationship. (Compl. ¶¶ 11, 12, 15.) The other Outside Directors were David P. Reiland and Terence P. Fox. (*Id.* ¶¶ 10, 13.) According to the Complaint, Fox appointed two Tontine entities "as proxy for all shares of Broadwind over which Fox had voting control." (*Id.* ¶ 13.)[2] The remaining member of the Board was defendant Drecoll. (*Id.* ¶ 14.)

Also in connection with the Tontine-Broadwind Stock Purchase Agreement, Tontine entered into a Registration Rights Agreement ("RRA") with Broadwind in 2007. (Prospectus at 83.)[3] Pursuant to that agreement, Tontine had the right to demand that Broadwind file a Registration Statement with the SEC registering all of Tontine's stock and providing for the resale of that stock pursuant to any legally available method. (*See id.*; RRA ¶ 2.3, attached as Exhibit 2 to Tontine Defendants' Memorandum ("Tontine Memo").) Tontine also had the right pursuant to the RRA to require that its shares be disposed of in an underwritten offering. (RRA ¶ 2.5(a).) In addition, an underwritten offering of Tontine's shares pursuant to the RRA triggered additional obligations on the part of the Company, including the obligation to take actions that Tontine or the underwriters reasonably requested to facilitate the disposition of Tontine's stock (*id.* ¶ 2.6(h)), and to pay certain expenses. (*Id.* ¶ 2.8.) (*See* Tontine Defendants' Memorandum ("Tontine Memo.") at 3-5.)

---

[2] In fact, the proxy was only in connection with certain matters: (1) ensuring that future acquisitions of stock by Tontine entities would not be subject to anti-takeover provisions, and (2) the election of members of the Board. (*See* Prospectus at 73-74.)

[3] The RRA was incorporated by reference in Broadwind's Form 10-K for the year ended December 31, 2008, which was in turn incorporated by reference in the Prospectus. (Prospectus at 95.) Documents incorporated by reference are considered to be "part of [the] prospectus." (*Id.*) Thus, this Court may consider the RRA connection with this motion to dismiss. *See* n. 1, *supra*.

The Prospectus stated that Broadwind was conducting the Offering to raise capital to repay outstanding debt and for general corporate purposes. (Prospectus at 7.) Broadwind was experiencing a severe liquidity crisis at the time, and the Prospectus described how critical the Offering was to Broadwind's survival, even stating that if the Offering were not completed, Broadwind might be forced into bankruptcy. (Prospectus at 49; Broadwind Memo. at 3-4.) In the Offering, Broadwind sold 10,000,000 of its shares. As was its right under the RRA, Tontine also participated in the Offering, selling 6,125,000 of its shares, and Broadwind's CEO, J. Cameron Drecoll, sold 1,125,000 of his shares. (Compl. ¶ 27.) Before expenses, but after underwriters' discounts, the selling shareholders received $5.4625 per share, with $54,625,000 going to Broadwind, $33,457,812.50 to Tontine, and $6,145,312.50 to Drecoll. After additional expenses, proceeds to Broadwind were approximately $53.9 million. (Compl. ¶¶ 27-28.) Accordingly, the additional expenses borne by Broadwind amounted to approximately $725,000.

In the first earnings release after the Offering, on March 12, 2010, Broadwind reported what plaintiffs characterize as a "surprisingly large" net loss of $92.6 million for the fourth quarter of 2009, a net loss of $110.1 million for the year, and a goodwill and intangible impairment charge of $82.2 million. (Compl. ¶ 32.) Plaintiffs allege that at the time of the Offering, "each of the Defendants knew, but did not disclose to the market," that Broadwind would have to take the impairment charge. (*Id.* ¶ 42.) The only support for that allegation is that in prior years, the completion of "annual goodwill and intangible asset impairment tests" had occurred earlier than March, and so the testing was allegedly intentionally performed later than in previous years, "because the Individual Defendants did not want to recognize or disclose the charge until after the completion of the Offering." (*Id.* ¶ 44.)

5

The Complaint alleges that the Individual Defendants (the Outside Directors and Drecoll) and Tontine wrongfully caused the Company to undertake the Offering "against the Company's best interests."  (*Id.* ¶ 2.)  The Complaint seeks to assert three claims in which the Outside Directors are named.  In Count I, the plaintiffs allege that the Outside Directors and Drecoll "breached their fiduciary duties of loyalty and good faith by causing and approving the Offering," which plaintiffs contend could not have been "an exercise of good faith business judgment."  (*Id.* ¶ 71.)  Count I asserts that as a result of the breaches of fiduciary duties, "the Company has sustained substantial damages, including, but not limited to, the expenses incurred in connection with the Offering."  (*Id.* ¶ 72.)

In Count II, plaintiffs claim that the Individual Defendants "wasted the Company's assets" by approving the Offering.  (*Id.* ¶ 75.)  Plaintiffs assert that "the terms of the Offering were so unfair to the Company that they constitute an exchange of corporate assets for consideration so disproportionately small as to lie beyond the range at which any reasonable person might be willing to trade or conduct a business transaction."  (*Id.* ¶ 74.)  Count II then repeats Count I's allegation regarding damages.  (*Id.* ¶ 76.)

In Count III, plaintiffs seek to assert a claim against Drecoll and all of the Outside Directors except Reiland for "breach of fiduciary duties for selling stock based on knowledge of material non-public information."  In that Count, plaintiffs claim that defendants Drecoll, Beynon, Fejes, Fox and Lindstrom "knew, but did not disclose to the public, material non-public information regarding the Company's true financial condition," and that they, "through Tontine," made the stock sales "on the basis of and because of their knowledge of that material non-public information," in breach of their fiduciary duties of loyalty and good faith.  (*Id.* ¶ 78.)  The Complaint alleges that the defendants named in Count III knew that when the truth came out, the

6

stock price would fall dramatically. (*Id.* ¶ 79.) Count III purports to seek "the imposition of a constructive trust on any proceeds that [defendants named in Count III] and/or Tontine obtained thereby." (*Id.* ¶ 80.)

## ARGUMENT

Delaware law governs this action. (*See* Broadwind Memo. at 5-6.) To avoid dismissal on a Rule 12(b)(6) motion, plaintiffs must plead "enough facts to state a claim to relief that is plausible on its face." *Twombly*, 550 U.S. at 570; *EEOC v. Concentra Health Services*, 496 F.3d 773, 776 (7th Cir. 2007); *Holzgrafe v. Hinsdale Bank & Trust Co.*, 2009 WL 3824651, at *2 (N.D. Ill., Nov.13, 2009). Although the Court must accept all well-pled allegations as true, a complaint must state a claim for relief that rises above the "speculative level," and must provide "more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Twombly*, 550 U.S. at 555; *Concentra*, 496 F.3d at 776. In addition, if the claim is predicated on allegations of fraud, Fed. R. Civ. P. 9(b) imposes a heightened standard of pleading, requiring that a plaintiff plead "all averments of fraud ... with particularity." All claims that "sound[ ] in fraud" are subject to Rule 9(b)'s particularity requirement. *Borsellino v. Goldman Sachs Group, Inc.*, 477 F.3d 502, 507 (7th Cir. 2007).

## I.    COUNT I DOES NOT STATE A CLAIM FOR BREACH OF FIDUCIARY DUTY AGAINST THE OUTSIDE DIRECTORS.

### A.  Plaintiffs Have Not Adequately Pleaded A Violation Of The Business Judgment Rule.

In Count I, plaintiffs allege that the Outside Directors breached their fiduciary duties because their approval of the Offering was not an exercise of good faith business judgment. As corporate directors, the Outside Directors are entitled to the protections of the business judgment rule, which presumes that "in making a business decision the directors of a corporation acted on an informed basis, in good faith and in the honest belief that the action taken was in the best

7

interests of the company." *Aronson v. Lewis*, 473 A.2d 805, 812 (Del. 1984), *overruled on other grounds by Brehm v. Eisner*, 746 A.2d 244 (Del. 2000). Directors are presumed to be disinterested and independent. *Beam ex rel. Martha Stewart Living Omnimedia, Inc. v. Stewart*, 845 A.2d 1040, 1048-49 (Del. 2004) ("directors are entitled to a *presumption* that they were faithful to their fiduciary duties"); *see also* Broadwind Memo. at 7-8, 13.

Plaintiffs have not alleged facts that would demonstrate that the decision to go forward with the Offering did not satisfy the business judgment rule. The allegations against the Outside Directors do not come close to alleging a plausible claim that the Outside Directors disregarded their fiduciary obligations. Indeed, if the Outside Directors had acted as plaintiffs contend that they should have, *that* would have constituted a breach of their fiduciary duties.

### 1. Tontine Had A Contractual Right To Have Its Shares Sold In An Underwritten Offering.

The fact that Broadwind permitted Tontine to participate in the Offering by selling its stock cannot support a breach of fiduciary duty claim. In fact, the Company had an *obligation* to permit Tontine to participate, given Tontine's rights under the RRA. The RRA gives Tontine the contractual right to require the Company to use its best efforts to register its shares and facilitate their sale through an underwritten offering. (RRA ¶¶ 2.3, 2.5(a); pp. 4-5, *supra*.) Broadwind (and the Outside Directors) could not, without breaching the contract with Tontine, prevent Tontine from selling its shares in the Offering. Indeed, as plaintiffs allege, defendants had an obligation to see that the Company lived up to its contractual obligations. (*See* Compl. ¶ 18: directors "were required to exercise reasonable and prudent supervision over the management, policies, practices and controls of the Company," including, among other things, to "exercise good faith to ensure that the Company ... *complied with all ... contractual obligations,*...") (emphasis added). (*See* Tontine Memo. at 4.)

It could hardly be a breach of fiduciary duty for the Outside Directors to ensure that the

Company complied with its contractual obligations. *See Hokanson v. Petty*, 2008 WL 5169633

(Del. Ch., December 10, 2008). In *Hokanson*, Altiva Corporation secured a capital contribution

from a third party, which received as partial consideration a Buyout Option. After the third party

exercised the Buyout Option and the Board entered into a Merger Agreement based on that

option, plaintiffs filed a derivative action, contending that the Board breached its fiduciary duties

by not demanding a higher purchase price. The court dismissed the complaint, concluding that

the purchase price had been contractually determined pursuant to the Buyout option, and so the

Company had no choice but to accept it:

> Because the plaintiffs are not challenging the validity of the Buyout Option
> itself, [and] have conceded that Purchase Price was consistent with the
> Contract Price Formula, … the plaintiffs are left with no basis to challenge
> the Altiva board's actions in agreeing to the Merger. Altiva was
> contractually obligated to enter into the Merger, and the Altiva board could
> not fail to do so without causing the company to dishonor a contract. The
> plaintiffs have cited no authority suggesting that the Altiva directors were
> mandated to cause the company to breach a contract and avoid the Merger.
> On this basis alone, the motion to dismiss must be granted.

*Id.* at *6. Similarly here, the Complaint does not challenge the validity of the RRA or

Broadwind's decision to enter into it, nor does the Complaint suggest any basis for alleging that

the Outside Directors should have caused Broadwind to breach the contract with Tontine.

### 2. The Offering Was Clearly In Broadwind's Best Interests.

Plaintiffs' breach of fiduciary duty claim is based on allegations that the Offering "was

intended to, and did, unduly benefit Tontine and Drecoll *at the expense of the Company*."

(Compl. ¶ 71 (emphasis added).) Plaintiffs fail to allege even in conclusory fashion how the

Company was *harmed* by the Offering. On the contrary, the Complaint does not assert that the

Offering was not an appropriate means of solving the Company's liquidity crisis. Nor does the

Complaint challenge the Prospectus's dire predictions that if the Offering were not completed,

Broadwind might be "unable to fund the working capital needs of our business." (Prospectus at 49.) Indeed, as the Prospectus disclosed, it may have been crucial to the Company's survival. (*See* p. 5, *supra*; Broadwind Memo. at 3-4.) Plaintiffs' own allegations establish that, far from being harmed, Broadwind actually benefited significantly by raising $53.9 million in additional capital. (Compl. ¶ 28.)

Further, the Complaint's allegations do not support the notion that the Offering was a "self-dealing transaction" on the part of Tontine. A self-dealing transaction occurs when a party receives an exclusive benefit, not shared by the company or its shareholders, which results in a detriment to the company. *In re Primedia Inc. Derivative Litigation*, 910 A.2d 248, 260-61 (Del. Ch. 2006). Here Broadwind, Tontine and Drecoll all sold stock in the same offering on the same terms, and all benefitted in the same fashion. (*See* Broadwind Memo. at 14-15.)

Given that there can be no dispute that Broadwind benefitted substantially from the Offering, and that it was not harmed by Tontine's sale of its stock, the only harm that the Complaint specifically alleges is that the costs of the Offering were borne by the Company alone. (Compl. ¶ 72.) The assertion that the costs incurred by Broadwind support a breach of fiduciary duty claim is frivolous. First, the Complaint concedes that Broadwind, Drecoll, and Tontine each paid their proportionate share of the underwriting discounts and expenses. (*Id.* ¶¶ 28-29.) What Broadwind paid were the additional costs, which amounted to approximately $725,000.[4] Once again, the Company, and not Tontine, was obligated to pay those expenses pursuant to the RRA. (*See* RRA ¶ 2.8; Compl. ¶ 31.) Not only was Broadwind obligated by an agreement that plaintiffs do not challenge to assist Tontine in the public sale of its stock and to pay the costs of

---

[4] After underwriters' discounts the Company received $5.4625 per share, or a total of $54,625,000. (Compl. ¶ 28.) After costs were deducted from the Company's proceeds, it received a total of $53.9 million. (*Id.*)

that Offering, the obligation to pay those expenses was clearly not a reason to stop the Offering. Plaintiffs cannot seriously contend that the obligation to pay $725,000 in costs in order to receive a $53.9 million infusion of capital provided any reason whatsoever for the Outside Directors to avoid the Offering, let alone that they had to do so to avoid breaching their fiduciary duties.[5] Because plaintiffs have suggested no other reason why the Company was harmed by the Offering, which on the face of the Complaint was clearly in the best interest of Broadwind, Count I does not plead "enough facts to state a claim to relief that is plausible on its face." *Twombly*, 550 U.S. at 571.

### B.  The "Entire Fairness" Doctrine Is Not Applicable Here.

Because application of the business judgment rule is so clearly fatal to their claims, plaintiffs allege that the Outside Directors are not entitled to the protections of that rule and that the "entire fairness" doctrine instead applies here.  A plaintiff can overcome the business judgment rule for a particular transaction by showing "that a majority of a board that approved the transaction in dispute was interested and/or lacked independence."  *Orman v. Cullman,* 794 A.2d 5, 23 (Del. Ch. 2002).  A director is interested when appearing on both sides of a transaction or when deriving a personal benefit that is not received by stockholders generally. *See Aronson,* 473 A.2d at 812; *Orman,* 794 A.2d at 23.  If the business judgment rule is rebutted, the burden shifts to the directors to prove the "entire fairness" of the transaction.  *Cede & Co. v. Technicolor, Inc.,* 634 A.2d 345, 361 (Del. 1993).  The Complaint's conclusory allegations here are insufficient to invoke the "entire fairness" doctrine.

---

[5] Nor can plaintiffs suggest that the fact that the Company paid all of the costs renders the transaction unfair.  Even apart from contractual obligations arising from the RRA, if the costs had been apportioned pro rata among the sellers, Broadwind would have still been obligated to pay $427,750.  Plaintiffs' cannot seriously argue that the $297,250 in incremental cost renders the transaction unfair or that the Company should have declined to enter into the transaction to receive $53.9 million in additional capital in order to save $297,250.

The Complaint does not allege, nor could it, that the Outside Directors derived a personal benefit from the Offering "not received by stockholders generally."  Indeed, plaintiffs do not allege that the Outside Directors received any benefit at all from the Offering.  The Complaint contains no allegations that any of the Outside Directors had any financial interest whatsoever in the decision to undertake the Offering.  Plaintiffs thus base their reliance on "entire fairness" solely on their conclusory allegation that the Outside Directors "stood on both sides of the decision to undertake the offering."  (Compl. ¶ 51.)  That allegation is based on two faulty premises:  first that the Outside Directors are "affiliated" with Tontine for purposes of the entire fairness rule, and second that Tontine was on the opposite side of the transaction from Broadwind.  As a matter of law, neither premise is accurate.

First, the mere fact that three of the Outside Directors were appointed by Tontine to the Board clearly is not sufficient to align them entirely with Tontine for purposes of the "entire fairness" doctrine, nor is the fact that one of the other Outside Directors gave a limited proxy to Tontine.  (*See* Compl. ¶ 65.)  *See, e.g., Aronson*, 473 A.2d at 815-16 (allegations that a controlling shareholder director "personally selected" each other director did not indicate a lack of independence); *Citron v. Fairchild Camera and Instrument Corp.*, 569 A.2d 53, 65 (Del. 1989) (director's representation of one of the company's largest shareholders did not make him an interested director);  *In re Dow Chem. Deriv. Litig.*, 2010 WL 66769, at *9 and n.48 (Del. Ch. Jan. 11, 2010) (allegations that directors were "hand picked" by another director insufficient to rebut presumption of loyalty).  In addition, the Complaint does not allege that any of the Outside Directors, other than Lindstrom, were employed by Tontine or had an ownership interest in Tontine.

12

Second, the "transaction" that plaintiffs challenge is the Offering, and Tontine and Broadwind were on the same side of that transaction, with the purchasers of Broadwind stock on the other side.  Under Delaware law, stock sales between insiders and third-party, marketplace buyers are evaluated according to a different standard from stock sales between insiders and the corporation.  *Guttman v. Huang*, 823 A.2d 492, 502 (Del. Ch. 2003).  (*See* Broadwind Memo. at 15.)  All three parties, Broadwind, Tontine, and Drecoll, sold shares to third-party purchasers. All three parties benefitted from the transaction.  Thus, in no sense did Tontine benefit at the expense of Broadwind, and the entire fairness doctrine has no applicability here.  (*See* Tontine Memo. at 7-10.)

## II.     COUNT II DOES NOT STATE A CLAIM FOR WASTE OF CORPORATE ASSETS.

Count II, which purports to assert a waste of corporate assets based on the same facts as Count I, seeks the same recovery on the basis of a different legal theory, but it suffers from the same fatal defects.  Instead of damages flowing from a breach of fiduciary duty, Count II asserts that the Offering resulted in a waste of corporate assets.  To recover on a claim of corporate waste, the plaintiffs must prove that the exchange was "so one sided that no business person of ordinary, sound judgment could conclude that the corporation has received adequate consideration."  *See In re Walt Disney Co. Deriv. Litig.*, 906 A.2d 27, 74 (Del. 2005), quoting *Brehm*, 746 A.2d at 263; *see also Brehm*, 746 A.2d at 263 (noting that valid claims of waste "are confined to unconscionable cases where directors irrationally squander or give away corporate assets"); Broadwind Memo. at 14-15.

First, the Complaint fails to state a claim for waste of corporate assets, because the only allegations set forth to support the claim are conclusory ones unsupported by facts.  (*See, e.g.,* Compl. ¶ 74 ("The terms of the Offering were so unfair to the Company that they constitute an

13

exchange of corporate assets for consideration so disproportionately small as to lie beyond the range at which any reasonable person might be willing to trade or conduct a business transaction.")) Plaintiffs do not even allege what terms of the Offering were unfair or "one-sided," let alone how the Offering represented an irrational squandering of corporate assets. They do not challenge the Company's business purpose in entering into the Offering to raise capital, nor do they challenge the stock price, the underwriting discount, or any other of the terms of the Offering. *See In Re Walt Disney*, 906 A.2d at 74. Indeed, the only alleged waste relates to the costs borne by the Company, and for the reasons stated above, a claim that paying those costs represented a waste of corporate assets is without merit.

Nor do plaintiffs allege how Tontine's sale of its Broadwind stock in the Offering wasted any Broadwind asset, even apart from the fact that Broadwind had no choice but to allow Tontine to exercise its contractual rights. In *In re Walt Disney*, the plaintiffs alleged that the Disney directors had wasted corporate assets by paying contractually required severance payments ("NFT amounts") to Michael Ovitz, who had been fired as Disney's CEO. The Delaware Chancery Court rejected that claim, holding:

> The claim that the payment of the NFT amount to Ovitz, without more, constituted waste is meritless on its face, because at the time the NFT amounts were paid, Disney was contractually obligated to pay them. *The payment of a contractually obligated amount cannot constitute waste*, unless the contractual obligation is itself wasteful.

*Id.* at 74 (emphasis added). Here, unlike Disney, Broadwind did not use corporate assets to pay Tontine anything as a result of the RRA, and the Complaint does not in any event allege that *entering into* the RRA with Tontine constituted a waste of assets. Thus, on its face the Complaint does not state a claim for waste of corporate assets. In addition, because the

14

Complaint supplies no supporting facts, Count II fails to satisfy the pleading requirements of Rule 8 and may be dismissed on that basis as well.

### III.  COUNT III SOUNDS IN FRAUD AND DOES NOT SATISFY THE PLEADING REQUIREMENTS OF RULE 8 OR RULE 9(b).

#### A.  Count III Does Not State A Plausible Claim For Relief.

In Count III, plaintiffs purport to assert a breach of fiduciary duty on the part of Drecoll and all but one of the Outside Directors, apparently for causing Tontine to sell its stock while the defendants were allegedly in possession of material inside information.  (*See* Compl. ¶ 78 (defendants "*through Tontine*, made the stock sales described herein on the basis of and because of their knowledge of . . . material inside information") (emphasis added).)

The basis of Count III is unclear.  At least as it relates to the Outside Directors, it cannot be based on any sales of Broadwind stock that they made, because they did not make any. Plaintiffs do not allege that Outside Directors Lindstrom, Beynon, Fejes, and Fox actually sold any stock.  Plaintiffs claim instead that these directors sold stock "through Tontine," but the Complaint does not allege that Tontine sold stock on their behalf or that they received any of the proceeds of Tontine's sale.  Indeed, the Complaint does not allege any financial connection between Tontine and the directors named in Count III other than Lindstrom's connection as a Tontine employee.

To the extent that the claim is premised on a relationship of the Outside Directors with Tontine, the claim is equally flawed, because it fails to allege any duty flowing from such relationship.  Because the only Outside Directors named in this Count are those who were either Tontine's nominees to the Board (Lindstrom, Fejes, and Beynon) or had given Tontine a limited proxy over that director's shares (Fox), plaintiffs appear to contend that the Tontine nominees and Fox should have somehow prevented Tontine from selling its shares in the Offering.  The

15

claim seems to be that those defendants owed some separate duty that they would not have owed were they not Tontine nominees. Plaintiffs do not, however, allege the basis or source of any such duty. Indeed, the Complaint contains no allegations as to what obligations the Tontine nominees owed simply by virtue of their status as nominees. Nor does the Complaint posit any legal theory for an obligation to prevent Tontine from selling stock pursuant to the Offering, particularly when Tontine had a contractual right to do so pursuant to the RRA. Without specifying any such duty, plaintiffs are left with the same fatally flawed breach of fiduciary duty claim that they attempt to assert in Count I.

If Count III is meant to assert a claim akin to an unjust enrichment claim, it fails as well. Unjust enrichment under Delaware law requires "(1) an enrichment, (2) an impoverishment, (3) a relation between the enrichment and impoverishment, (4) the absence of justification and (5) the absence of a remedy provided by law." *Cantor Fitzgerald, L.P. v. Cantor,* 724 A.2d 571, 585 (De. Ch.1998). First, and most fundamentally, plaintiffs do not allege, nor could they, that any Outside Director was personally unjustly enriched by the Offering. They did not sell any stock in the Offering, nor do plaintiffs allege that the Outside Directors nominated by Tontine were anything other than nominees; they did not receive any payments or compensation from Tontine. Even if plaintiffs could somehow attribute Tontine's sale of stock to the Outside Directors, there is no relationship between Tontine's "enrichment" and any "impoverishment" of Broadwind. In *Oakland County Employees' Retirement System v. Massaro*, 736 F. Supp. 2d 1181, 1188 (N.D Ill. 2010), the court considered a claim of unjust enrichment based on sales of Huron Consulting stock allegedly based on inside information. In rejecting that claim, the Court held that:

> even assuming that defendants were enriched by these sales, there is no relation between this enrichment and any impoverishment of Huron. That is, it was not Huron but unknown buyers in the open market who purchased Huron stock in the allegedly suspect sales. Huron simply has no interest in

16

> the monies paid to defendants by these buyers, and thus no unjust
> enrichment claim based on the stock sales.

*Id.* at 1188.  Thus, Count III does not plead a factual basis to support plaintiffs' theory of liability

as required by Rule 8.  *See Twombly,* 550 U.S. at 570.

### B.  Count III Does Not Supply The Particularity Required By Rule 9(b).

To the extent that Count III is premised on alleged trading on the basis of inside, non-

public information, it sounds in fraud and is subject to the heightened pleading requirements of

Rule 9(b).  It is well settled that the applicability of Rule 9(b)'s pleading standard turns not on

the title of the claim but on the underlying facts alleged in the complaint.  *Borsellino*, 477 F.3d at

507.  Where a claim, whatever its title, "sounds in fraud," meaning it is premised upon a course

of fraudulent conduct, Rule 9(b) is implicated.  *Id*.; *Schaufenbuel v. InvestForClosures Financial*

*LLC*, No. 09 C 1221, 2009 WL 3188222, at *3 (N.D. Ill Sept. 30, 2009).  One of the purposes of

Rule 9(b) is "to ensure that the party accused of fraud, a matter implying some degree of moral

turpitude and often involving a wide variety of potential conduct, is given adequate notice of the

specific activity that the plaintiff claims constituted the fraud so that the accused party may file

an effective responsive pleading."  *Lachmund v. ADM Investor Services, Inc*., 191 F.3d 777, 783

(7th Cir. 1999) (internal quotations omitted.)  The crux of Count III is that Messrs. Lindstrom,

Beynon, Fox, Fejes, and Drecoll were allegedly in the possession of inside, undisclosed

information that was negative and the defendants knew it, they knew that its inevitable disclosure

would result in a significant drop in the stock price, and yet they approved the Offering anyway.

That is a claim that sounds in fraud.

To plead a claim with particularity under Rule 9(b), a plaintiff must allege the "who,

what, when, where, and how" of the fraud.  *Borsellino*, 477 F.3d at 507 (internal quotations

omitted).  Even if these directors had sold stock, plaintiffs' conclusory allegations regarding the

17

Outside Directors' alleged possession of material, non-public information fall far short of the pleading requirements of Rule 9(b).  They lump the four Outside Directors together in this Count without specifying with respect to any of them what inside information they had or when each had it.  *See Goren v. New Vision Int'l, Inc.,* 156 F.3d 721, 730 (7th Cir.1998) ("lumping together" of defendants and treating "all the defendants as one" insufficient under Rule 9(b)); *Ackerman v. Northwestern Mut. Life Ins. Co.,* 172 F.3d 467, 471 (7th Cir.1999) (applying Rule 9(b) to common law fraud claims).

Plaintiffs also make conclusory allegations of knowledge of the alleged inside information without any factual support.  *See DiLeo v Ernst & Young*, 901 F.2d 624, 629 (7th Cir. 1990) (allegation that defendant "had actual knowledge of the materially false and misleading nature of the statements and omissions set forth above," were "boilerplate" not sufficient under Rule 9(b)).  *Cf. Guttman*, 823 A.2d at 502 (Del. Ch. 2003) (directors are not deemed interested "whenever a derivative plaintiff cursorily alleges that he made sales of company stock in the market at a time when he possessed material, non-public information.") Here plaintiffs have not even alleged that anyone at Broadwind, let alone the Outside Directors, was in possession of material, non-public information prior to the Offering.  Indeed, plaintiffs' conclusory allegations are contradicted by their allegation that the Company's goodwill impairment analysis was not even completed until February or March of 2010, at least a month after the Offering took place.  (Compl. ¶¶ 48-49.)

Additionally, plaintiffs do not allege that the Outside Directors received the results of the goodwill impairment analysis prior to the Offering, and thus there is no basis for a conclusion that they even possessed the alleged non-public information.  *See Guttman*, 823 A.2d at 505. The Complaint alleges that "[t]he impairment charge was well known to the Individual

Defendants, as current and former Broadwind directors and executives who comprise a majority of the Board, and was discussed formally and informally during Board meetings, management meetings, and other meetings attended by the Individual Defendants." (Complaint ¶ 43.) Even that allegation fails to make any specific allegations regarding each Outside Director, what knowledge he had regarding impairments, or when he gained such knowledge. Finally, to the extent that plaintiffs suggest that the Outside Directors violated a duty of disclosure, plaintiffs do not specify what disclosures were misleading, what additional disclosures should have been made, or what involvement if any the Board had in the preparation of the disclosures. *Cf. In re Citigroup Inc. S'holder Deriv. Litig.*, 964 A.2d 106, 133 (Del. Ch. 2009).

Moreover, not only does the Complaint lack the requisite specificity, but it is based on the impermissible assumption that the defendants behaved irrationally. The Outside Directors had nothing to gain from the Offering, had nothing to gain from an inflated stock price in the Offering, and would have no reason to delay the inevitable disclosure if they had the information that plaintiffs allege. *See DiLeo*, 901 F.2d at 629 (complaint did not allege that defendant "had anything to gain from any fraud," and it would have been irrational for defendant to have joined in alleged fraud). As the Seventh Circuit held in *DiLeo*, "People sometimes act irrationally, but indulging ready inferences of irrationality would too easily allow the inference that ordinary business reverses are fraud. One who believes that another has behaved irrationally has to make a strong case." *Id.* "Rote conclusions" will not suffice. *Id.* Plaintiffs make no effort to supply a reason for the Outside Directors to behave in such an irrational fashion. Thus, Count III fails to supply the particularity required by Rule 9(b).

## CONCLUSION

For the foregoing reasons, the Consolidated Derivative Complaint should be dismissed with prejudice as to Defendants David P. Reiland, James M. Lindstrom, Charles H. Beynon, William T. Fejes, Jr., and Terence P. Fox.

Respectfully submitted,


Dated:  September 19, 2011                                    /s/ Jeffrey R. Tone

John M. George, Jr.
Jeffrey R. Tone
Katten & Temple LLP
542 S. Dearborn, Suite 1060
Chicago, IL 60605
(312) 663-0800
jgeorge@kattentemple.com
jtone@kattentemple.com