# Exhibit C

Westlaw.

Page 1

Not Reported in A.2d, 2004 WL 187274 (Del.Ch.)
**(Cite as: 2004 WL 187274 (Del.Ch.))**

▷ Only the Westlaw citation is currently available.

UNPUBLISHED OPINION. CHECK COURT RULES BEFORE CITING.

Court of Chancery of Delaware.
KHANNA
v.
COVAD COMMUNICATIONS GROUP, INC.

No. 20481-NC.
Submitted Dec. 15, 2003.
Decided Jan. 23, 2004.

Dear Counsel:

NOBLE, J.

*1 This is an action brought under 8 *Del. C.* § 220 by Petitioner Dhruv Khanna ("Khanna") to inspect certain books and records of Respondent Covad Communications Group, Inc. ("Covad"), a Delaware corporation. Khanna is the largest individual holder of Covad's common stock and is a former general counsel and executive vice president. He claims to have sought inspection of Covad's books and records to advance his investigation into an alleged pattern of self-dealing by several members of Covad's board. Many, if not most, of the events which hold Khanna's interest occurred during his tenure as general counsel. This is the Court's decision following trial.

I.

On June 10, 2003, Khanna made demand (the "Demand") upon Covad to inspect certain corporate records.[FN1] He set forth the following purposes for his demand:

> FN1. Joint Exhibit ("JX") 1.

The purposes of this demand are: (1) to enable [Khanna] to investigate whether the Company's directors (a) breached their fiduciary duties in connection with the investigation of [his] allegations of wrongdoing, as well as in connection with the underlying transactions themselves or (b) otherwise acted unlawfully to the detriment of shareholders; and (2) to enable [Khanna] to evaluate whether a valid basis exists to bring a shareholder action to challenge the transactions, Board member actions or elections or otherwise seek shareholder redress.

Khanna listed the documents which he sought to inspect:

1. all Company Board of Directors' (the "Board" or the "Board of Directors") minutes and resolutions from May 1, 2002 to the present, including minutes and resolutions from any and all Board committees or subcommittees;

2. all Company Board of Directors' minutes and resolutions authorizing, ratifying or otherwise approving (a) the Company's investment in Certive, Inc. on or about November 1999, (b) the Company's acquisition of BlueStar Communications Group, Inc. ("BlueStar") on or about September 2000, (c) the Company's post-BlueStar acquisition pay-out of additional shares of the Company to former BlueStar shareholders based on these shareholder's earn-out rights on or about April 2001, or (d) the Company's settlement with DishnetDSL on or about February 2002;

3. all Company Board of Directors' minutes and resolutions authorizing, ratifying or otherwise approving (a) the founding of Certive Inc. by Mr. Charles McMinn, (b) Mr. Richard Shapero's joining the Board of Directors of BlueStar Communications Group, Inc .(c) Mr. Frank Marshall or Mr. Dan Lynch joining the Board of Advisors of Certive, Inc., or (d) Mr. Charles McMinn joining the Board of Directors of DishnetDSL;

4. all documents provided to, considered by, or generated by any committed or subcommittee (however denominated) of the Board or of the Board's audit committee in 2002 or thereafter, including any law firm(s) or other agents hired by such committee(s) or subcommittee(s) (hereinafter individually or collectively, "Special Investigative Committee") to investigate allegations that certain directors and executive officers of the Company had breached their fiduciary duties and/or otherwise

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in A.2d, 2004 WL 187274 (Del.Ch.)
**(Cite as: 2004 WL 187274 (Del.Ch.))**

engaged in allegedly unlawful or otherwise wrongful conduct while acting on behalf of the Company;

**\*2** 5. all documents provided to, considered by, or generated by the Special Investigative Committee to investigate any alleged improprieties in the manner by which the Company or its officers or agents handled the investigation conducted by or the investigative report(s) prepared by Gary Scholick in 2002 concerning a former executive officer;

6. all documents constituting, reflecting or evidencing any form of directive from the Board or a Board committee or subcommittee defining the purposes, scope of work, or tasks of the Special Investigative Committee (including any retention letters signed by the Special Investigative Committee retaining any agents or law firms), or modifying any such purposes, scope of work or tasks;

7. all documents presented to the Company's Board of Directors or any committee or subcommittee thereof relating to the findings and investigation of the Special Investigative Committee;

8. all documents reviewed or considered by the Special Investigative Committee in concluding that the allegations of wrongdoing "were without merit and that it would not be in the best interests of the Company to commence litigation based upon these allegations," as represented in the Company's Form 10-K filed with the Securities and Exchange Commission on or about March 20, 2003;

9. all documents reviewed or considered by the Board of Directors, or any member or members thereof, in concluding that Dhruv Khanna should be terminated as an employee of the Company, as represented in the Company's Form 10-K filed with the Securities and Exchange Commission on or about March 20, 2003;

10. all documents constituting, reflecting or evidencing communications between or among current or former members of the Board of Directors, executive officers or senior employees (directors and above) of the Company, including, but not limited to, all electronic mail communications, relating to (a) the allegations that certain members of the Board and certain executive officers had breached their fiduciary duties, (b) the Board's investigation of these allegations, (c) the addition of Richard Jalkut to the investigating group of directors into the allegations, (d) the removal of the investigation into the allegations from the umbrella of the Audit Committee to the umbrella of the full Board, (e) the resignation of Chuck Haas as an officer and employee of the Company, (f) the retirement of Frank Marshall as a director of the Company, (g) the departure of Mr. Robert Knowling from the Company on or about October 2000, (h) the return of Mr. McMinn as Chairman of the Board, or the appointment of Mr. Frank Marshall as the interim CEO on or about October 2000, (i) the hiring of Mr. Hoffman as CEO of the Company on or about June 2001, (j) the performance of Mr. Hoffman as CEO of the Company since June 2001, (k) the public statements of Mr. Hoffman concerning the Company's financial performance and projections, (l) the public statements of the Company concerning the percentage of its total revenue that is derived from its direct sales channel, (m) the Confidentiality Agreement signed between Mr. Charles Hoffman and Dhruv Khanna on or about July 11, 2002 and extending on or about July 23, 2002, (n) amending or modifying the Proxy Statement issued by the Company on or about June 7, 2002, or postponing the Annual Meeting held on July 25, 2002, or (o) correspondence sent by or on behalf of Dhruv Khanna to the Board, or any committee or subcommittee, member, or agent or representative thereof;

**\*3** 11. all documents constituting, evidencing, or reflecting communications between and among the Company (including its individual directors and officers) and its external auditors concerning the substance of or the need to disclose to the public Dhruv Khanna's allegations in 2002 and 2003;

12. all documents relating to or reflecting the retention of outside counsel to advise the Company on the content of its public disclosures from June 2002 through the present and the non-involvement or abandonment of other outside counsel on this issue;

13. all documents relating to or reflecting any investigation conducted by or on behalf of the Company or its Board or a committee or subcommittee thereof into representations made to the auditors by executive officers of the Company during the years

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in A.2d, 2004 WL 187274 (Del.Ch.)
**(Cite as: 2004 WL 187274 (Del.Ch.))**

2000-2003, inclusive;

14. all documents constituting, reflecting or evidencing the Company's or the Board's document retention policies or the communications between or among current or former members of the Board, executive officers and senior employees (directors and above) of the Company concerning the retention or destruction of documents since June 1, 2000.

Covad, through its counsel, on June 18, 2003, denied, in large measure, Khanna's request and offered several reasons for its position, which may be summarized as follows: (1) his articulated purposes were a sham because he was seeking redress, or otherwise to retaliate, for his termination from Covad through future employment litigation; [FN2] (2) Khanna could not meet his burden to demonstrate that corporate wrongdoing had probably occurred; (3) his purposes were vague and overly broad; (4) his purposes were both a sham and an exercise in futility because he would not have standing to act as a derivative plaintiff in any action against Covad's directors; (5) the requested documents were not reasonably related to his asserted purposes; and (6) many of the documents were privileged.[FN3] Covad challenged Khanna's motives by claiming that Khanna sought access to its books and records to advance claims arising out of his dismissal as general counsel, an action which Khanna has asserted was, in part, the product of discrimination based on national origin and an effort to punish him for "whistle blowing."

> FN2. In June 2002, Khanna was removed from his position as Covad's general counsel and placed on leave. Covad terminated Khanna at the end of 2002.

> FN3. JX 2. Covad offered to produce limited portions of board minutes if Khanna agreed not to use them in any employment-related litigation.

II.

Khanna filed this action on August 11, 2003. He sought access to the same books and records as set forth in the Demand. On September 25, 2003, purportedly worried that his substantive claims against Covad's directors for breach of their fiduciary duties might become time barred, he brought a class and derivative action (the "Derivative Action") against the directors of Covad and against Covad as a nominal defendant.[FN4] In that action, Khanna alleges, for his derivative claims, that Covad's directors breached their duty of loyalty in approving four transactions in which certain directors were interested and, for his class claims, that Covad failed to make necessary and appropriate disclosures to its shareholders.

> FN4. *Khanna v. McMinn,* C.A. No. 20545 (Del. Ch.).

III.

**\*4** The issues for the Court's resolution are whether:

1. By filing the Derivative Action, Khanna has waived his right to pursue, or is otherwise precluded from pursuing, this books and records action.[FN5]

> FN5. This issue was initially presented by Covad's motion to dismiss, the briefing of which was completed three days before trial and, although argument of that motion was held on the morning of trial, its resolution was reserved until the Court's post-trial decision.

2. Khanna has a primary purpose arising out of his standing as a shareholder or, instead, his principal motivation is to advance his personal employment-related claims against Covad and its directors.

3. Khanna has sufficiently demonstrated the potential for corporate wrongdoing to support his purpose for seeking inspection.

4. If Khanna cannot qualify to be a representative plaintiff in the Derivative Action, he should be permitted to pursue this action.

5. The documents, or some of them, sought by Khanna are protected from inspection by the attorney-client privilege or the work product doctrine.

6. The Demand is too broad in its scope and certain documents requested are not properly the subject of a Section 220 action.[FN6]

> FN6. The Demand was in writing and under oath, stated a purpose, and was directed to

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in A.2d, 2004 WL 187274 (Del.Ch.)
**(Cite as: 2004 WL 187274 (Del.Ch.))**

Covad's principal place of business.

IV.

1. *The Derivative Action as terminating Khanna's rights under Section 220.*

Covad contends that this Section 220 action should be dismissed because (1) Khanna's filing of the Derivative Action demonstrates that he no longer needs to inspect the corporation's books and records because his counsel must have been confident with the information available to them in order to file his complaint without running afoul of Court of Chancery Rule 11; and (2) otherwise, Khanna would be pursuing "backdoor" discovery during the pendency of the Derivative Action.[FN7] I conclude that Covad has not set forth adequate grounds in support of its application for dismissal of this action.

> FN7. The defendants in the Derivative Action have moved to dismiss.

Covad premises both of its arguments on fundamental principles. First, by filing the Derivative Action, Khanna's counsel, by virtue of Court of Chancery Rule 11, certified that they had sufficient information to justify proceeding with the Derivative Action. Thus, Covad argues, no production under Section 220 should be necessary. Second, "derivative plaintiffs are not entitled to discovery to assist their compliance with Rule 23.1." [FN8] Covad argues that granting Khanna the opportunity to inspect its books and records through Section 220 after the filing of the Derivative Action would be tantamount to allowing discovery during the pendency of the motion to dismiss.

> FN8. *Rales v. Blasband,* 634 A.2d 927, 934 n.10 (Del.1993); *see also Scattered Corp. v. Chi. Stock Exch., Inc.,* 701 A.2d 70, 78 (Del.1997).

Covad overlooks the simple reality that the overlap of the Section 220 action and the Derivative Action is attributable to Covad's failure to comply with its obligations under Section 220 when the Demand was made.[FN9] By failing to produce timely the requested documents, Covad created the conditions about which it now complains. Covad's suggestion that a shareholder's rights under Section 220 lapse when the substantive litigation is filed would, if accepted, encourage corporations to shirk their Section 220 duties and to engage in dilatory conduct in the hopes that the passage of time-and the need for the potential plaintiff to move forward with his litigation-would allow them to avoid their obligations altogether. If Covad was wrong when it rejected Khanna's Section 220 demand, it cannot now obtain vindication simply because Khanna concluded that the derivative and class claims would suffer if he did not file his substantive action.[FN10] Moreover, merely because Khanna's counsel concluded that they had sufficient information to file a complaint does not preclude the possibility, or even the likelihood, that additional information to which Khanna may otherwise be entitled, would bolster his response to a motion under Court of Chancery Rules 12(b)(6) or 23.1. Survival of a motion to dismiss, of course, requires more than the defense of a motion under Court of Chancery Rule 11.

> FN9. For this aspect of this letter opinion, I assume that Khanna has otherwise submitted a proper demand under Section 220.

> FN10. Covad questions that the running of the statute of limitations caused Khanna to move forward with the Derivative Action. It points out that two of the challenged transactions occurred well over three years, the applicable period if the question is controlled by 10 *Del. C.* § 8106, before the filing of the Derivative Action and that the other two transactions occurred substantially less than three years before. While Khanna's articulated reason for the timing of the filing of the Derivative Action is, at best, somewhat puzzling, the issue is not why Khanna filed when he did or whether he had to file when he did but, instead, whether Khanna should be forced to face the choice of filing or waiting for the appropriate production under Section 220 which had been delayed because of Covad's failure to produce the documents which he was entitled to inspect under Section 220.

*5 The cases relied upon by Covad do not require the opposite conclusion. In *Taubenfeld JT v. Marriott International, Inc.*,[FN11] the Section 220 demand was made roughly five months after the defendants in the substantive action had moved for dismissal. Such an open effort to circumvent the prevailing view that discovery should not be allowed during the pendency of a motion to dismiss a derivative action is far dif-

Not Reported in A.2d, 2004 WL 187274 (Del.Ch.)
**(Cite as: 2004 WL 187274 (Del.Ch.))**

ferent from the facts here. In this case, Khanna made his request to inspect the records far enough in advance of his filing of the Derivative Action that it was reasonable to have expected that he would have obtained the appropriate documents before commencing the substantive litigation.

> FN11. 2003 WL 22682323 (Del. Ch. Oct. 28, 2003).

Similarly, in *Parfi Holding, A.B. v. Mirror Image Internet, Inc .,* [FN12] the Court concluded that a Section 220 demand in the midst of related litigation would be underly burdensome. Again, the burden here, if any, only occurred because, assuming again that Khanna has a proper Section 220 demand, Covad chose not to meet its statutory obligations to one of its shareholders.

> FN12. C.A. No. 18457 (Del. Ch. Mar. 23, 2001) (bench ruling).

Accordingly, Covad's motion to dismiss the action because Khanna subsequently filed the Derivative Action is denied.[FN13]

> FN13. Covad posits that significant harm could arise from the relatively contemporaneous filing of a Section 220 action and the related substantive action. It should be a sufficient answer that when and if that problem arises, it will be addressed. The Court obviously has, whether in the Section 220 action or in the substantive action, the power to take such steps as are necessary to protect a party from the abuse of the judicial process, if such an action is warranted. Covad correctly points out that Khanna could have moved more quickly to present his Section 220 demand and then to have filed this action more promptly. However, his demand was sufficiently far in advance of the filing of the Derivative Action that it did not impose any undue burden on Covad and it does not relieve Covad of its statutory obligations.

2. *The propriety of Khanna's purpose.*

Khanna must demonstrate that his primary purpose as to each category of the Demand is proper.[FN14] "A proper purpose shall mean a purpose reasonably related to such person's interest as a stockholder."[FN15]

Khanna's articulated purpose of investigating self-dealing by members of Covad's board is undoubtedly a proper purpose.[FN16] However, because Khanna was dismissed from his position as Covad's general counsel and has threatened to take action in response to that dismissal, Covad challenges the truthfulness of Khanna's articulated purpose and argues that many of his requests are not to serve any corporate or shareholder purpose but, instead, are to assist his employment-related claims. The mere existence of potential individual (as contrasted with shareholder) claims against the corporation or its officers and directors does not necessarily defeat inspection rights under Section 220. On the other hand, the existence of such potential personal claims provides a basis for further inquiry into the shareholder's purpose. Khanna has defused these concerns, to an extent, however, with his commitment "not to use any documents produced in response to his Section 220 request in any potential litigation against Covad on wrongful termination grounds."[FN17] Thus, I find, with the support of Khanna's commitment that documents produced in response to any order entered in this action will not be used, unless obtained through the course of discovery in other actions, that Khanna's primary purpose in making a demand under Section 220 is the advancement of his shareholder-based claims and, thus, is a primary proper purpose.[FN18]

> FN14. *Thomas & Betts Corp. v. Leviton Mfg. Co.,* 681 A.2d 1026, 1031-33 (Del.1996).

> FN15. 8 *Del. C.* § 220(b).

> FN16. *See Saito v. McKesson HBOC, Inc.,* 806 A.2d 113, 116 (Del.2002); DONALD J. WOLFE, JR. & MICHAEL A. PITTENGER, CORPORATE AND COMMERCIAL PRACTICE IN THE DELAWARE COURT OF CHANCERY § 8-6[e] at 8-76 (2003) (hereinafter "WOLFE & PITTENGER").

> FN17. Pl.'s Post-Trial Br. at 9.

> FN18. Investigation of corporate wrongdoing to facilitate pursuit of shareholder litigation, of course, is not the only "proper purpose."
>
>> [S]tockholders may use information about corporate mismanagement in other ways, as well. They may seek an audience with

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in A.2d, 2004 WL 187274 (Del.Ch.)
**(Cite as: 2004 WL 187274 (Del.Ch.))**

the board to discuss proposed reforms or, failing in that, they may prepare a stockholder resolution for the next annual meeting, or mount a proxy fight to elect new directors.

Saito v. McKesson HBOC, Inc., 806 A.2d at 117. Although Khanna's demand letter makes passing reference to a purpose of "otherwise seek[ing] shareholder redress," he has not relied upon that purpose during the course of this action.

That Khanna has a proper primary purpose for his Section 220 demand does not necessarily lead to the conclusion that all of the books and records which he seeks to inspect are reasonably related to his proper purpose. Thus, the Court must assess and, if appropriate, limit the scope of his demands in light of his articulated proper purpose.

Khanna also seeks to advance a claim based on Covad's alleged failure to make necessary and timely disclosures regarding the substance of his allegations, his "whistle blowing" efforts, and their consequences. Developing adequate information to evaluate a disclosure claim, as a general matter, is an appropriate purpose for a Section 220 demand.

3. *The sufficiency of Khanna's allegations of corporate wrongdoing.*

   **\*6** In order to obtain access to a corporation's books and records for the purpose of investigating corporate wrongdoing, the shareholder must "demonstrate by a preponderance of the evidence 'some credible basis from which the court can infer that waste or mismanagement may have occurred.'" FN19 The stockholder, however, is not under any obligation to prove by preponderance of the evidence that any wrongful conduct actually occurred. FN20 Khanna seeks documents regarding four challenged transactions. FN21 He has shown for each of the transactions a credible basis for inferring that wrongful conduct may have occurred because of self-dealing benefiting certain members of Covad's board of directors in transactions that ultimately proved materially adverse to Covad's financial interests.

FN19. *Carapico v. Phila. Stock Exch., Inc., 791 A.2d 787, 792 (Del. Ch.2000)* (quoting *Thomas & Betts Corp.,* 681 A.2d at 1031).

FN20. *Sec. First Corp. v. U.S. Diecasting and Dev. Co.,* 687 A.2d 563, 568 (Del.1997).

FN21. Khanna alleges wrongdoing in four transactions which may be briefly summarized:

(1) *Certive.* The Chairman of Covad's board formed an entity known as Certive, Inc. to provide services within the general scope of Covad's business without first affording Covad the opportunity to evaluate that business opportunity. Thereafter, the Chairman induced Covad to invest in Certive. Other members of Covad's board held financial interests in Certive or were dependent upon the Chairman.

(2) *BlueStar 1.* Covad acquired BlueStar Communications Group, Inc., a less-than-successful competitor of Covad, at an inflated price because several members of Covad's board owned, directly or indirectly, a substantial interest in BlueStar. Moreover, the fairness opinion obtained by Covad was submitted by a firm that also was owed in excess of $25 million by BlueStar, an indebtedness that Covad assumed through the acquisition process.

(3) *BlueStar 2.* The BlueStar stockholders were entitled to additional shares of Covad if, after the acquisition, the BlueStar business unit met certain operating targets. Although BlueStar unit failed to meet those objectives, Covad awarded the former BlueStar shareholders with a significant portion of the performance-based additional stock. Roughly half of the additional stock was distributed to Covad directors.

(4) *DishNet.* Covad acquired an equity interest in DishNet for $23 million. Disputes arose, and a settlement was reached in

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in A.2d, 2004 WL 187274 (Del.Ch.)
**(Cite as: 2004 WL 187274 (Del.Ch.))**

which Covad relinquished its interest in DishNet for $3 million, thus absorbing a $20 million loss. Covad's Chairman was deeply involved with DishNet and, thus, was in a conflicted position because of his interests in both of the feuding entities.

Covad responds to Khanna's efforts to establish a sufficient likelihood of corporate wrongdoing by seeking to prove that he could not prevail on his claims. For example, it argues that various transactions were approved by a majority of directors whose independence and disinterestedness are not fairly questioned by Khanna. Instead of contesting whether Khanna has a credible basis for believing that corporate wrongdoing occurred, Covad attempts to debate whether Khanna will ultimately prevail.[FN22]

> FN22. For example, Covad argues that the BlueStar 2 compromise was a reasonable effort to minimize litigation risk.

A Section 220 action is not the proper forum for litigating a breach of fiduciary duty case. All that the Section 220 plaintiff must show is a credible basis for claiming that "there are legitimate issues of wrongdoing." Here, Khanna has shown that each of the transactions was initiated to assist some Covad directors to their personal material benefit and that the transactions carried serious adverse consequences of a degree that could be perceived as the product of mismanagement or flawed, and possibly conflicted, judgment. To engage in the detailed analysis-an analysis possibly less plaintiff friendly than one that would be carried under Court of Chancery Rules 23.1 or 12(b)(6) because, in part, the facts might be those provided by the corporate insiders-would defeat the purposes of this summary proceeding and the underlying policy guidance that potential plaintiffs use the procedures of Section 220 to determine if a case exists for the shareholder to pursue. [FN23] The shareholder seeking to investigate corporate wrongdoing, if Covad's analytical approach were adopted, would first be required to survive the functional equivalent of a merits-based dismissal motion in the substantive action.[FN24] While the analysis to be undertaken in considering those motions is, of course, important, the Section 220 action is not the proper forum for that analysis.[FN25]

> FN23. *See, e.g.,* Guttman v. Huang, 823 A.2d 492, 504 (Del. Ch.2003).

> FN24. "[A] bare allegation of curiosity or suspicion will not suffice. This is not to say that the plaintiff is obligated to prove the existence of wrongdoing to secure inspection of relevant corporate books and records under Section 220, however. Both the stated purpose and the underlying need for information necessarily derive from an absence of conclusive facts, and such a standard would beg the ultimate question at issue." WOLFE & PITTENGER, § 8-6[e] at 8-76.

> FN25. In general and particularly with respect to DishNet, Khanna may ultimately fall well short of demonstrating that anything wrong occurred. His allegations do, however, supply a credible basis to support his right as a shareholder to investigate further the conduct leading to a substantial corporate loss in a matter in which the Chairman had a substantial and conflicted interest.

In summary, the question is not whether Covad can raise substantial doubt about the viability of Khanna's claims of wrongdoing. It is sufficient if he provides a credible basis for believing that wrongdoing may have occurred. On the record before me, I am satisfied that he has done so with respect to the four challenged transactions.[FN26]

> FN26. With respect to the Certive transaction, Covad has represented, Def.'s Post-Trial Mem. at 11, that certain directors of Covad had not, at the time of that transaction, become involved with Certive. Thus, Covad asks for leave to reopen the record for the introduction of that evidence. I deny that application because (1) Covad had full opportunity to present this evidence at trial; (2) in light of the Court's concerns about litigating fiduciary duty claims in a Section 220 action, the result might not change; and (3) at issue here is a shareholder's access to the records of the corporation, a potential burden on the corporation of substantially less impact than a liability determination against either the corporation or, as would be more likely in this context, its directors.

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in A.2d, 2004 WL 187274 (Del.Ch.)
**(Cite as: 2004 WL 187274 (Del.Ch.))**

4. *Khanna as representative plaintiff.*

***7** Covad next argues that Khanna's extensive involvement with it should preclude him from acting as a representative plaintiff. For example, Khanna, as Covad's general counsel, was necessarily involved to some extent with the allegedly self-dealing transactions and likely possesses privileged information. Whether a shareholder will file a complaint or whether that shareholder will be a proper representative plaintiff are not questions that determine a shareholder's rights under Section 220. The appropriate place for determining the adequacy of a representative plaintiff is in the action in which the shareholder aspires to that status.

5. *Khanna's inspection of documents subject to the attorney-client privilege or the work product doctrine.*

According to Covad, many of the categories defined by Khanna contain documents subject either to the attorney-client privilege or the work product doctrine. In general, in an action under Section 220, non-opinion work product may be inspected if the party seeking discovery "shows it has a *substantial need* for the materials and it cannot acquire a substantial equivalent without *undue hardship.*" FN27 Access to opinion work product may be obtained only if "the requesting party shows it is directed to the pivotal issue in the current litigation and the need for the information is compelling." FN28 Finally, the attorney-client privilege may be avoided by a Section 220 plaintiff who can demonstrate " 'good cause' why the privilege should not attach." FN29

> FN27. *Saito v. McKesson HBOC, Inc.,* 2002 WL 31657622, at *11 (Del. Ch. Nov. 13, 2002), *aff'd,* 808 A.2d 970 (Del.2003).
>
> FN28. *Id.* at *12.
>
> FN29. *Deutsch v. Cogan,* 580 A.2d 100, 107 (Del. Ch.1990). In order to ascertain the existence of "good cause," the Court will look to the following relevant factors of those identified in *Garner v. Wolfinbarger,* 430 F.2d 1093 (5th Cir.1970): "(i) the number of shares owned by the shareholder and the percentage of stock they represent; (ii) the assertion of a colorable claim; (iii) the necessity of the information and its unavailability from other sources; (iv) whether the stockholders identified the information sought and is not merely fishing for the information; and (v) whether the communication is advice concerning the litigation itself ." *Grimes v. DSC Communications Corp.,* 724 A.2d 561, 568 (Del. Ch.1998).

Khanna, however, has not sought to circumvent either the attorney-client privilege or the work product doctrine and, certainly, has not made any necessary showing. Accordingly, any of the inspection directed through this action is first subject to the attorney-client privilege and the work product doctrine.FN30 Unfortunately, no privilege log has been compiled and the potentially privileged documents have not been identified. Accordingly, any dispute regarding whether a particular document is protected from disclosure by either the attorney-client privilege or the work product doctrine cannot be addressed unless and until it arises.

> FN30. Thus, the Court is not called upon to consider whether the relative weight of one of the *Garner* factors-"whether the communication is advice regarding the litigation itself"-should be given greater weight because of the pendency of the Derivative Action.

6. *Consideration of the various categories of the Demand.*

A stockholder's right to inspect a corporation's books and records under Section 220

> does not open the door to the wide ranging discovery that would be available in support of litigation.... A stockholder who demands inspection for a proper purpose should be given access to all of the documents in the corporation's possession, custody or control, that are necessary to satisfy that proper purpose. Thus, where a § 220 claim is based on alleged corporate wrongdoing, and assuming the allegation is meritorious, the stockholder should be given *enough information to effectively address the problem,* either through derivative litigation or through direct contact with the corporation's directors and/or stockholders.FN31

> FN31. *Saito,* 806 A.2d at 114-15 (emphasis added); see *Carapico,* 791 A.2d at 793.

**\*8** "[O]nly those records that are 'essential and sufficient' to the shareholder's purpose will be included in the court-ordered inspection," FN32 and

Not Reported in A.2d, 2004 WL 187274 (Del.Ch.)
**(Cite as: 2004 WL 187274 (Del.Ch.))**

Khanna bears the burden of satisfying that standard.[FN33]

> FN32. *Helmsman Mgmt. Servs., Inc. v. A & S Consultants, Inc.,* 525 A.2d 160, 167 (Del.Ch.1987); *see also Dobler v. Montgomery Cellular Holding Co., Inc.,* 2001 WL 1334182, at *5 (Del. Ch. Oct. 19, 2001).
>
> FN33. Indeed, if Section 220 afforded a shareholder the full panoply of discovery rights, the goal of avoiding the costs and burdens of unnecessary discovery reflected in the policy of staying discovery while derivative and class actions are tested by motions to dismiss would be frustrated.

Thus, a review of each category of documents sought by Khanna follows:

*Demand No. 1*

Through this category, Khanna seeks board minutes and resolutions after his termination. It is necessary to his proper purpose to ascertain if the board, after his termination, fully addressed the various issues surrounding his allegations of corporate wrongdoing.

*Demand No. 2*

Minutes and resolutions approving the challenged transactions are prime examples of documents to which a shareholder in a Section 220 action is entitled. Covad represents that all documents in this category have been produced to Khanna. If that is the case, this request is moot. Otherwise, it is an appropriate request.

*Demand No. 3*

The documents in this category are also appropriate for inspection. Again, Covad represents that they have been produced and, if so, the request is moot.

*Demand No. 4*

It is "sufficient" and "essential" to Khanna's appreciation of the potential for wrongful conduct to be able to inspect the various documents within this category, which generally addresses corporate consideration of his allegations, although it may be that many, or even most, of them are privileged.

*Demand No. 5*

The documents in this category are appropriately produced to the extent that they relate to the challenged transactions. However, to the extent that they address the reasons for Khanna's termination, they are not sufficiently related to his proper purpose as a shareholder but, instead, are directly and primarily related to his personal status as a former employee; the scope of this demand is accordingly limited.

*Demand No. 6*

The terms and conditions under which the special committee operated to investigate Khanna's claims constitute an appropriate topic for him in his shareholder capacity because the integrity of the special committee's actions may have an impact on the validity of any action that he has filed or might intend to file in his capacity as shareholder.

*Demand No. 7*

Covad contests the appropriateness of this category by asserting that the special committee made all ultimate decisions and, thus, there was no "recommendation" to the board. From that premise, it argues that no responsive documents exist. Again, to the extent that such materials are not privileged, the conclusions of the special committee as to Khanna's allegations of wrongdoing would be appropriate for his stockholder inquiry.

*Demand No. 8*

The documents requested in this category presumably would largely be included in the inspection afforded in previous categories because one would assume that the special committee would have reviewed those documents which are responsive to Khanna's request regarding the challenged transactions. To the extent that there are any responsive documents which are not privileged and which are not otherwise addressed by the previous categories, they are to be produced.

*Demand Nos. 9, 11 and 12*

**\*9** A common theme flows through these three demands. Khanna seeks to understand why more (or accurate) information about his termination and whistle blowing efforts was not disclosed to the shareholders. Khanna has not shown that documents which might provide those reasons are essential for his purposes. He does not contend that he does not know

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in A.2d, 2004 WL 187274 (Del.Ch.)
**(Cite as: 2004 WL 187274 (Del.Ch.))**

(i) the facts involving his personal conduct; (ii) the substance of the allegations which he made; or (iii) the substance and timing of the public disclosures which Covad made. Yet, that is "enough information to effectively address the problem." In short, Khanna's search for documents which may explain why Covad made the disclosures as it did is beyond the scope of this Section 220 application.[FN34]

> FN34. I also note that Covad, as to Demand Nos. 11 and 12, maintains that there are no responsive documents. Def.'s Post-Trial Mem. at 18-19.

*Demand No. 10*

The scope of this request is overly broad. A Section 220 action is not a substitute for discovery under the rules of civil procedure.[FN35] For instance, Request 10(o) which seeks correspondence sent by or on behalf of Khanna to the board or any representative thereof is an example of documents for which Khanna has not shown any necessity and which he should be aware of in any event. Moreover, to require the production of all communications, including e-mails, among directors and officers of Covad, under these circumstances, would be excessive. The appropriate documents, *i.e.,* necessary for purposes reasonably related to his status as stockholder, consist of those documents which are not the documents of individuals but, instead, are those which are held by the corporation. Furthermore, Khanna has shown no need for documents in the following categories of Demand No. 10:(e), (f), (g), (j), (m). Subject to these limitations, inspection of the documents in this category is appropriate.

> FN35. *Saito,* 806 A.2d at 117 n.10.

*Demand No. 13*

This inquiry is so broad that its apparent purpose cannot be ascertained and cannot clearly be tied to those areas of wrongdoing which Khanna has challenged. The scope of this request will be approved as narrowed to one involving documents held by Covad which reflect representations made to its auditors by its executive officers regarding the four challenged transactions for the years 2000-03, inclusive.

*Demand No. 14*

A document retention policy is necessary for a shareholder to appreciate this completeness, in a historical sense, of the documents which are produced to him. Thus, the document retention policy will alert the shareholder as to whether there may have been other documents which would have been responsive to his request but which have been destroyed in the ordinary course of business. Khanna will be allowed to inspect the document retention policy.

V.

Khanna, subject to the limitations set forth above, has demonstrated his entitlement to inspect certain books and records of Covad. Counsel are directed to confer promptly and submit a form of order to implement this decision.

Del.Ch.,2004.
Khanna v. Covad Communications Group, Inc.
Not Reported in A.2d, 2004 WL 187274 (Del.Ch.)

END OF DOCUMENT

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.