**UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

---------------------------------------------------------x
BONNIE MITCHELL and MICHAEL :
FRIEDMAN, Derivatively on Behalf of :
Nominal Defendant BROADWIND :
ENERGY, INC., : Case No. 11-CV-01059
:
              Plaintiff, : Honorable Robert W. Gettleman
:
              v. :
:
DAVID P. REILAND, *et al.*, :
:
              Defendants, :
:
   and :
:
BROADWIND ENERGY, INC., :
:
             Nominal Defendant. :
---------------------------------------------------------x


**TONTINE DEFENDANTS' REPLY MEMORANDUM IN FURTHER SUPPORT OF
MOTION TO DISMISS VERIFIED CONSOLIDATED SHAREHOLDER DERIVATIVE
COMPLAINT**

**TABLE OF CONTENTS**

**PAGE**

INTRODUCTION ................................................................................................................ 1

I. THE COMPLAINT FAILS TO STATE A CLAIM AGAINST TONTINE FOR AIDING AND ABETTING A BREACH OF FIDUCIARY DUTY ................................................. 3

    A. The Complaint Does Not Allege that Broadwind Paid Any Costs and Expenses of the Offering Beyond What It Was Obligated to Pay Under the March 2007 Registration Rights Agreement ............................................................................ 3

    B. Plaintiffs Fail to Show a Breach of Fiduciary Duty ............................................... 6

    C. Plaintiffs Fail to Show Tontine's Knowing Participation In Any Breach of Fiduciary Duty ...................................................................................................... 8

II. THE COMPLAINT FAILS TO STATE A CLAIM AGAINST TONTINE FOR UNJUST ENRICHMENT ............................................................................................................... 10

    A. Plaintiffs Do Not Claim That Broadwind Was Impoverished as a Result of Tontine's Stock Sales ........................................................................................... 11

    B. Plaintiffs Do Not Adequately Plead Fraudulent Stock Sales by Tontine ............. 12

CONCLUSION .................................................................................................................... 13

**TABLE OF AUTHORITIES**

**CASES**                                                              **PAGE(S)**

*Cantor Fitzgerald, L.P. v. Cantor*,
   724 A.2d 571 (Del. Ch. 1998).................................................................................................11

*In re Gen. Motors (Hughes) S'holder Litig.*,
   No. Civ. A. 20269, 2005 WL 1089021 (Del. Ch. May 4, 2005),
   *aff'd*, 897 A.2d 162 (Del. 2006) ............................................................................................8, 9

*Jackson Nat'l Life Ins. Co. v. Kennedy*,
   741 A.2d 377 (Del. Ch. 1999)..........................................................................................11, 12

*Kahn v. Tremont Corp.*,
   694 A.2d 422 (Del. 1997).........................................................................................................8

*In re Maxim Integrated Prods.,Inc. Derivative Litig.*,
   574 F. Supp. 2d 1046 (N.D. Cal. 2008).................................................................................13

*McGowan v. Ferro*,
   No. Civ. A. 18672-NC, 2002 WL 77712 (Del. Ch. Jan. 11, 2002)......................................9, 10

*Oakland Cnty. Emps. Ret. Sys. v. Massaro*,
   736 F. Supp. 2d 1181 (N.D. Ill. 2010) ..............................................................................11, 12

*In re Primedia Inc. Derivative Litig.*,
   910 A.2d 248 (Del. Ch. 2006)..................................................................................................8

*In re Santa Fe Pac. Corp. S'holders Litig.*,
   669 A.2d 59 (Del. 1995).........................................................................................................10

*Schock v. Nash*,
   732 A.2d 217 (Del. 1999)......................................................................................................12

*Weinberger v. UOP, Inc.*,
   457 A.2d 701 (Del. 1983) .......................................................................................................8

**RULES**

Fed. R. Civ. P. 9(b) .......................................................................................................................12

Fed. R. Civ. P. 12(b)(6).................................................................................................................1


The Tontine Defendants respectfully submit this reply memorandum in response to Plaintiffs' Memorandum in Opposition to Defendants' and Nominal Defendant's Motions to Dismiss (the "Opposition" or "Pl. Br.") and in further support of Tontine's motion to dismiss the Complaint pursuant to Fed. R. Civ. P. 12(b)(6).[1]

## INTRODUCTION

As demonstrated in Tontine's opening brief, Broadwind's receipt of nearly $54 million in badly needed capital coupled with Tontine's contractual right to sell its Broadwind shares in an underwritten offering obliterates the Complaint's central theory: that the January 2010 Offering was an "improper self-dealing transaction" undertaken solely to benefit Tontine and Mr. Drecoll. (*See* Compl. ¶¶ 2, 38, 51-52, 55-57, 83). In response, Plaintiffs have abandoned that theory altogether. Recognizing that the Company, Tontine and Drecoll all sold shares to third-party buyers in the Offering and thus all stood on the same side of the stock sale transactions, Plaintiffs now expressly concede that they are "not challenging the fairness of the Offering itself." (Pl. Br. at 11; *see also id.* at 5-6, 8-11).

Instead, the Opposition makes abundantly clear that Plaintiffs now challenge only "the terms of the Offering apportioning costs and expenses between the Company, Tontine and Drecoll." (Pl. Br. at 11). But the Complaint contains no well-pled allegations in support of this dramatically watered-down theory either. Indeed, the Opposition actually *concedes* that the March 1, 2007 Registration Rights Agreement between the Company and Tontine contained provisions governing costs and expenses that the Company was required to pay in connection with any underwritten offering of Tontine's Broadwind shares. (*Id.* at 11). Nowhere does the Opposition point to a single fact alleged in the Complaint suggesting that the Company paid *any*

---

[1] Unless otherwise defined herein, all capitalized terms have the meaning ascribed to them in the Tontine Defendants' opening brief filed on September 19, 2011 (Dkt. No. 90) ("Tontine Br.").

costs and expenses that it was not contractually obligated to pay under the Registration Rights Agreement, which was negotiated and entered into *before* Tontine owned any Broadwind stock or had any nominees on its Board. There is simply no basis for the Complaint's theory that the Individual Defendants breached any fiduciary duty in connection with the allocation of the costs and expenses of the Offering, much less that Tontine knowingly participated in any purported breaches of fiduciary duty.

Likewise, the Opposition does not even attempt to argue that the allegations in the Complaint satisfy the elements of unjust enrichment required under Delaware law. Specifically, given that all participants in the Offering – Broadwind, Tontine and Mr. Drecoll – sold shares of Broadwind stock to third-party purchasers in the open market, there is, and can be, no contention that Tontine's stock sales in the Offering created a concomitant impoverishment suffered by Broadwind. Plaintiffs offer no argument to the contrary. Nor does the Opposition refute Tontine's arguments demonstrating that the very premise of Plaintiffs' unjust enrichment claim, *i.e.,* that Tontine's stock sales were based on its knowledge of material, non-public information regarding Broadwind's financial condition and future business prospects, is wholly unsupported by the well-pled allegations required under controlling law.

For the reasons set forth in Broadwind's motion to dismiss, the Complaint should be dismissed because of Plaintiffs' failure to adequately allege demand futility in compliance with Rule 23.1. But even if Plaintiffs were able to clear that initial pleading hurdle, they still have failed to state viable claims against Tontine either for aiding and abetting breaches of fiduciary duty or for unjust enrichment. The claims against Tontine, therefore, should be dismissed.

**ARGUMENT**

I.   **THE COMPLAINT FAILS TO STATE A CLAIM AGAINST TONTINE FOR AIDING AND ABETTING A BREACH OF FIDUCIARY DUTY**

As the Opposition makes clear, Plaintiffs' claims for breach of fiduciary duty – including their aiding and abetting claim against Tontine – now rest on their allegation that the Defendants improperly "caused Broadwind to pay for a disproportionate share of the costs and expenses in connection with the Offering." (Pl. Br. at 8-9; *see* Compl. ¶ 31). But the Complaint pleads nothing, and the Opposition argues nothing, supporting that bare conclusion. Accordingly, there is no foundation for Plaintiffs' arguments that the "entire fairness" standard of review applies, that the Individual Defendants breached their fiduciary duties, or that Tontine knowingly participated in any breach.

   A.   **The Complaint Does Not Allege that Broadwind Paid Any Costs and Expenses of the Offering Beyond What It Was Obligated to Pay Under the March 2007 Registration Rights Agreement**

As explained in Tontine's opening memorandum, the Company's pre-existing contractual obligations not only permitted Tontine to sell its Broadwind shares in an underwritten offering of the Company's stock, but required the Company to pay certain costs and expenses in connection with any such offering. (Tontine Br. at 4, 12-14). Specifically, the March 2007 Registration Rights Agreement provided that "[a]ll expenses incident to the Company's performance of or compliance with this Agreement" – including compliance with its obligation to "take all such reasonable actions" to facilitate an offering of the Tontine shares – "will be borne by the Company." (Ex. 2, §§ 2.5(a), 2.6, 2.8). Broadwind was expressly obligated to pay, among other things: (1) the registration and filing fees in connection with the Offering; (2) the costs associated with complying with federal or state securities laws; (3) printing, messenger and delivery expenses; (4) the fees and disbursements of counsel,

3

independent auditors, and other professionals retained by the Company; and (5) fees and expenses of counsel retained by Tontine in connection with the Offering. (*Id.* at § 2.8).

Despite tacitly conceding these obligations under the Registration Rights Agreement, the Opposition claims that "Plaintiffs alleged that Broadwind paid costs and expenses for Tontine and Drecoll it wasn't required to under these agreements."[2] (Pl. Br. at 11). Tellingly, the Opposition studiously avoids citing the Complaint in support of that claim, and for good reason: no such allegation appears in the Complaint. The sum total of the Complaint's allegations consist of the wholly conclusory assertions that the Offering was inherently unfair to the Company because it supposedly bore a "substantial portion" or "disproportionate share" of the associated costs and expenses. (Compl. ¶¶ 30-31, 51). The Complaint fails even to mention the Company's obligations to pay costs and expenses under the Registration Rights Agreement, let alone allege, even in a cursory way, that the Company paid costs and expenses in connection with the Offering beyond what the Registration Rights Agreement required it to pay.

Nor does the Complaint or the Opposition point to any facts that would suggest that Broadwind paid any costs and expenses beyond those required under the Registration Rights Agreement. Indeed, there are no facts pled regarding the amount of costs and expenses improperly paid by Broadwind, if any, or what those costs and expenses purportedly consisted of. Rather, the theory of the Complaint seems to be that Tontine should have paid its "proportionate" share of the Offering's expenses based on the number of shares it sold in comparison to the total shares sold. But the Registration Rights Agreement shows that that

---

[2] As explained in Mr. Drecoll's opening brief (Dkt. No. 84), at 3-4, an October 2007 agreement between Mr. Drecoll and Broadwind gave Mr. Drecoll rights similar to those possessed by Tontine under its Registration Rights Agreement with the Company.

4

theory is untenable. Tontine had a contractual right, which it bargained for many years ago, to have the Company bear the expenses of an offering of Tontine shares.[3]

Plaintiffs' allegation that the Company and Tontine entered into "one or more undisclosed agreements governing the payment of costs and expenses" likewise fails to satisfy their pleading burden. (Pl. Br. at 4, 8-9; Compl. ¶ 31). No facts whatsoever are pled in support of that wholly conclusory allegation. Moreover, the allegation utterly ignores the *disclosed* agreement – the Registration Rights Agreement – that by its terms *did* govern the payment of costs and expenses in connection with the Offering.

Finally, Plaintiffs' repeated assertions that Tontine and the Individual Defendants "admit" or "do not even attempt to dispute" that Broadwind paid more costs and expenses in connection with the Offering than it should have (Pl. Br. at 1, 4, 9) are simply wrong. To the contrary, Tontine and the Individual Defendants expressly noted that Broadwind was contractually obligated to pay costs and expenses associated with the Offering and that, in any event, what Plaintiffs alleged was the "proportionate" amount of Tontine and Drecoll's expenses was *de minimis* in the context of the Offering as a whole, which raised $54 million in badly needed capital for the Company. (Tontine Br. at 13 & n.6). In short, Plaintiffs' rank speculation notwithstanding, the Complaint lacks any well-pled allegations indicating that Broadwind paid "any other fees and expenses 'incurred by or on behalf of' Tontine and Drecoll" other than those it was expressly required to pay under the Registration Rights Agreement. (Pl. Br. at 11).

---

[3] Under the Registration Rights Agreement, Tontine was required to pay any underwriting discounts attributable to the sale of its shares. (Ex. 2, § 2.8). But it is undisputed that Tontine did pay those underwriting discounts. As the Complaint itself alleges, the reported $33.4 million in stock sale proceeds realized by Tontine were expressly "*after* underwriters' discounts." (Compl. ¶¶ 28-29 (emphasis added); *see also* Ex. B, at cover page). In fact, had Tontine's proceeds been based on the public offering price of $5.75 per share rather than the $5.4625 per share price after underwriters' discounts, Tontine's sale of 6.125 million shares in the Offering would have generated proceeds of $35,218,750 before expenses (or $1,760,937.50 more than Plaintiffs allege). (*See* Compl. ¶¶ 27-29).

### B.   Plaintiffs Fail to Show a Breach of Fiduciary Duty

Having abandoned the Complaint's insupportable contention that Tontine "stood on both sides" of the Offering itself (*see* Compl. ¶ 51), Plaintiffs now retreat to the argument that the entire fairness standard of review nevertheless should apply because Tontine (and Drecoll) "stood on the opposite side of the Company" in regard to the allocation of the costs and expenses of the Offering. (Pl. Br. 10). That argument, however, is patently without merit.

It is beyond dispute that the rights and obligations embodied in the Registration Rights Agreement were negotiated and agreed to in March 2007, nearly three years prior to the Offering. As is plain from its face, the March 1, 2007 Registration Rights Agreement between the Company and Tontine is the epitome of an arm's-length transaction, negotiated and executed "as a condition precedent to the consummation of" Tontine's initial $15.4 million equity investment in the Company. (*See* Ex. 2, at 1; *see also* Ex. B, at 81-83). As such, the Registration Rights Agreement was negotiated and agreed to *before* Tontine owned a single share of Broadwind stock; *before* Tontine nominated a single Broadwind director;[4] and *before* any of the Individual Defendants – other than Mr. Fox, the Company's "founding stockholder" (Compl. ¶ 13) – even served on the Broadwind Board. (*Id.* ¶¶ 10-12, 14-15).

This is fatal to Plaintiffs' theory that the allocation of costs and expenses in the Offering constitutes "self-dealing" and is thus subject to entire fairness review. Plaintiffs do not and cannot challenge the fairness of the Registration Rights Agreement, which governed the allocation of costs and expenses for the Offering. And Plaintiffs cannot plausibly claim that the Individual Defendants breached any fiduciary duties by causing the Company to honor its pre-existing contractual obligations, negotiated and agreed to at arm's-length long before all but one

---

[4]   Tontine did not nominate any directors to the Broadwind Board until October 2007. (Ex. B, at 82).

6

of those defendants even arrived at the Company. Indeed, as the Complaint itself alleges, the Individual Defendants were duty bound to "ensure that the Company . . . complied with . . . all contractual obligations." (Compl. ¶ 18).

Plaintiffs' repeated assertions that Tontine exercised "significant control over Broadwind and its Board" at the time of the Offering (Pl. Br. at 4, 10-11, 13-14, 23, 27) are thus irrelevant, as is their criticism of Tontine's nominees to the Board, Mr. Fox and Mr. Drecoll for "fail[ing] to abstain from participation in the negotiation and agreement of this self-interested transaction." (*Id.* at 11). The allocation of costs and expenses for the Offering involved no "self-interested" transaction over which Tontine could have exercised control or as to which the directors could have been required to abstain; the parties had resolved this issue by contract long before the Offering.

In any event, the Opposition wholly fails to justify the Complaint's characterization of Tontine as a "controlling shareholder" under Delaware law. The Opposition makes *no* effort to dispute Tontine's showing that neither Tontine's minority stock ownership nor its contractual right to nominate three Broadwind directors were sufficient to render Tontine a controlling shareholder under well-established Delaware law. (*See* Tontine Br. at 9-10 & n.5). Instead, Plaintiffs merely quote the Company's disclosure that Tontine had "the voting power to *significantly influence* [Broadwind's] policies, business and affairs, and the outcome of any corporate transaction or other matter." (Pl. Br. at 3-4, 10-11, 23, 27 (emphasis added)). But an allegation that Tontine was, by virtue of its stock ownership and ability to nominate directors, in a position to *influence* Broadwind's affairs does not remotely satisfy Plaintiffs' pleading burden

7

under Delaware law: facts sufficient to show Tontine's *actual domination or control* of Broadwind's day-to-day affairs or the transaction being challenged. (Tontine Br. at 9-10).[5]

In short, Plaintiffs' assertion "that the Individual Defendants conferred an exclusive benefit upon Tontine and Drecoll by causing the Company to pay their Offering costs and expenses" is wholly imaginary. (Pl. Br. at 9). The Complaint fails to allege any breach of fiduciary duty by the Individual Defendants in connection with the allocation of the costs and expenses of the Offering and, for this reason alone, the Complaint fails to state an aiding and abetting a breach of fiduciary duty claim against the Tontine Defendants. *See, e.g., In re Gen. Motors (Hughes) S'holder Litig.*, No. Civ. A. 20269, 2005 WL 1089021, at *23 (Del. Ch. May 4, 2005), *aff'd*, 897 A.2d 162 (Del. 2006).

### C. Plaintiffs Fail to Show Tontine's Knowing Participation In Any Breach of Fiduciary Duty

The parties agree that to adequately allege the knowing participation element of an aiding and abetting a breach of fiduciary duty claim "there must be factual allegations in the complaint" from which to reasonably infer that Tontine "act[ed] with knowledge that the conduct advocated or assisted constitutes such a breach." (*See* Pl. Br. at 26; Tontine Br. at 11). Here, the Opposition contends that Tontine knowingly participated in the Individual Defendants' alleged

---

[5] Tacitly acknowledging their failure to plead facts justifying their characterization of Tontine as a controlling shareholder, Plaintiffs argue that they do not need to show that Tontine was a controlling shareholder in order to establish a "self-dealing" transaction triggering the entire fairness standard of review. (Pl. Br. at 10). But the entire crux of the Complaint is that Tontine purportedly used its "controlling shareholder" status to "cause" Broadwind's directors to engage in an improper self-dealing transaction. (*See, e.g.,* Compl. ¶¶ 2, 9, 23, 26, 38, 51-57, 65). And the only cases Plaintiffs cite in support of their assertion that entire fairness should apply (Pl. Br. at 8-9) involve controlling shareholders. *See Weinberger v. UOP, Inc.*, 457 A.2d 701, 705 (Del. 1983) (challenging a cash out merger of minority stockholders by the company's majority shareholder); *Kahn v. Tremont Corp.*, 694 A.2d 422, 428 (Del. 1997) (cited by Plaintiffs for the proposition that entire fairness applies "'in a challenged transaction involving self-dealing by a controlling shareholder'"); *In re Primedia Inc. Derivative Litig.*, 910 A.2d 248, 260 (Del. Ch. 2006) (cited by Plaintiffs for the proposition that "entire fairness applies where a controlling shareholder causes a self-dealing transaction").

fiduciary breach arising out of their purported approval of "the allocation of the Offering costs to unfairly benefit Tontine and Drecoll to the detriment of Broadwind." (Pl. Br. at 27). Plaintiffs premise their contention on the principle that, in certain cases, "the terms of the negotiated transaction themselves [may be] so suspect as to permit, if proven, an inference of knowledge of an intended breach of trust." (Pl. Br. at 26 (citations omitted)). Yet for many of the same reasons previously discussed, this is clearly not such a case.

Plaintiffs do not point to any "*specific facts* from which [the] court could reasonably infer [Tontine's] knowledge of" a breach by the Individual Defendants. *McGowan v. Ferro*, No. Civ. A. 18672-NC, 2002 WL 77712, at *2 (Del. Ch. Jan. 11, 2002) (emphasis in original; citation omitted). Nor can they. As set forth in Tontine's opening brief, Broadwind's pre-existing contractual obligations under the Registration Rights Agreement preclude any inference that the Individual Defendants' approval of the Offering itself was "inherently wrongful" or that Tontine knowingly participated in any such breach. (Tontine Br. at 12-14). This same conclusion applies with equal force to the Board's alleged approval of an unfair allocation of the costs and expenses of the Offering. *See Gen. Motors*, 2005 WL 1089021, at *26 ("This court has consistently held that 'evidence of arm's-length negotiation with fiduciaries negated a claim of aiding and abetting, because such evidence precludes a showing that the defendants knowingly participated in the breach by the fiduciaries.'") (citations omitted).

Rather, Plaintiffs argue merely that Tontine's knowledge of a breach of fiduciary duty should be inferred from Tontine's purported "power and control over" the three directors it nominated after the Registration Rights Agreement was executed. (Pl. Br. at 27). But Plaintiffs do not, and obviously cannot, explain how the fact that Tontine nominated directors to the Board remotely supports an inference that Tontine *knew* that the Individual Defendants breached their

9

fiduciary duties by causing Broadwind to comply with its pre-existing contractual obligations. The only reasonable inference that can be drawn from Plaintiffs' allegations is that Tontine understood that the costs and expenses of the Offering were being allocated in accordance with the parties' agreement, with Tontine paying the expenses it was required to pay (*e.g.*, the underwriters' discounts associated with the Tontine shares, *see* n.3, *supra*) and Broadwind paying the expenses it was required to pay.[6]

Under any pleading standard, "[c]onclusory statements that are devoid of factual details to support an allegation of knowing participation will fall short of the pleading requirement needed to survive a Rule 12(b)(6) motion to dismiss." *McGowan*, 2002 WL 77712, at *2 (internal quotations omitted); *see also In re Santa Fe Pac. Corp. S'holders Litig.*, 669 A.2d 59, 72 (Del. 1995) (same).

## II. THE COMPLAINT FAILS TO STATE A CLAIM AGAINST TONTINE FOR UNJUST ENRICHMENT

As demonstrated in Tontine's opening brief, Plaintiffs' unjust enrichment claim is deficient for two reasons: (1) because Tontine sold its shares to the market, not to the Company, the Company was not impoverished as a result of those sales; and (2) the Complaint does not sufficiently plead that Tontine sold its stock on the basis of material nonpublic information. The Opposition fails to refute either aspect of Tontine's showing.

---

[6] While Plaintiffs also claim that Tontine's Board nominees "were aware of the requirement to annually conduct (and timely disclose the results of) the goodwill impairment test" (Pl. Br. at 27), this claim has nothing to do with Plaintiffs' aiding and abetting claim against Tontine, which is limited to the alleged fiduciary breach in connection with the costs and expenses of the Offering. (*See id.* (arguing that Plaintiffs meet the damages element of an aiding and abetting claim *solely* by virtue of "Broadwind's payment of an unfair amount of the Offering costs")). In any event, Plaintiffs' bare conclusions that the Tontine-nominated directors knew that Broadwind tested for goodwill impairment annually and that the price of Broadwind's stock dropped soon after the results were announced in March 2010 says nothing of *when* the directors knew that the value attributed to the Company's goodwill was impaired, much less that Tontine had any such advance knowledge.

10

### A. Plaintiffs Do Not Claim That Broadwind Was Impoverished as a Result of Tontine's Stock Sales

Despite a fleeting reference to the well-established elements of unjust enrichment under Delaware law (Pl. Br. at 28), Plaintiffs do not even argue that their claim against Tontine meets each of those elements. Instead, Plaintiffs argue that they need allege no more than that Tontine obtained the stock sale proceeds "[un]justifiably or "against the fundamental principles of equity and good conscience" to survive dismissal. (*Id.* at 29). That is wrong.

Plaintiffs' attempt to cast aside *Oakland Cnty Emps. Ret. Sys. v. Massaro*, 736 F. Supp. 2d 1181 (N.D. Ill. 2010), on the ground that it "misstates Delaware law" is unavailing. (*See* Pl. Br. at 29; Tontine Br. at 15-16). The court in *Massaro* applied Delaware law, and dismissed an unjust enrichment claim brought derivatively based on alleged insider stock sales because, as here, "it was not [the company] but unknown buyers in the open market who purchased [company] stock in the allegedly suspect sales" by the insiders. 736 F. Supp. 2d at 1188. Accordingly, *Massaro* correctly held that the plaintiffs had not stated a viable claim for unjust enrichment given their inability to plead "any impoverishment" of the company that would support its recovery of the stock sale proceeds. *Id.* (citing *Cantor Fitzgerald L.P. v. Cantor*, 724 A.2d 571, 585 (Del. Ch. 1998)). Nothing in *Jackson Nat'l Life Ins. Co. v. Kennedy*, 741 A.2d 377, 392 (Del. Ch. 1999), upon which Plaintiffs rely (Pl. Br. at 29), is to the contrary.

In *Jackson*, plaintiffs alleged that Benchmark Holdings, Inc.'s president and sole director (Kennedy) and the acquirer of Benchmark's business (Fort James) had effectively "stripped" Benchmark of all of its assets by unfairly allocating all sales proceeds to a newly formed partnership between Kennedy and Fort James, whereas the preferred shareholder "received nothing" and "was left holding preferred stock rendered worthless in a corporate shell." 741 A.2d at 382-84. Thus, in *Jackson*, the company clearly was alleged to have been

11

impoverished as a result of the defendants' acts – its assets were siphoned into another entity. Indeed, the court denied the motion to dismiss plaintiffs' unjust enrichment claim precisely because plaintiffs "pleaded sufficiently the allegations that *Defendants were enriched* by their actions *to the impoverishment of* Benchmark Holdings and Jackson National" and "a *clear relation exists* between the enrichment and impoverishment." *Id.* at 394 (emphasis added).

As in *Massaro* and unlike *Jackson*, Plaintiffs' unjust enrichment claim seeking disgorgement of Tontine's stock sale proceeds fails because the Complaint does not, and cannot, allege that Broadwind has suffered any related impoverishment. There is simply no authority for Plaintiffs' contention that the Company – on behalf of which Plaintiffs claim to be suing – is entitled to recover the stock sale proceeds Tontine received through the Offering simply because it was allegedly "enriched" by the Individual Defendants' purported breaches of their fiduciary duties. (Pl. Br. at 29). Because Broadwind "simply has no interest in the monies" Tontine received from its stock sales to purchasers in the open market, Plaintiffs' unjust enrichment claim fails as a matter of law.[7] *Massaro,* 736 F. Supp. 2d at 1188.

### B. Plaintiffs Do Not Adequately Plead Fraudulent Stock Sales by Tontine

Plaintiffs do not dispute that, under controlling Seventh Circuit law, the heightened pleading requirements of Fed. R. Civ. P. 9(b) apply to unjust enrichment claims that "sound in fraud." (Tontine Br. at 16-17 (citing cases)). Plaintiffs suggest that their unjust enrichment claim alleges only "bad faith," not fraudulent conduct. (Pl. Br. at 25-26). But that suggestion is flatly contradicted by the Complaint, which squarely alleges a "scheme" purportedly "devised" to allow the Tontine Defendants to "knowingly" trade on the basis of

---

[7] Plaintiffs' own cited case law is in accord. *See Schock v. Nash*, 732 A.2d 217, 232 (Del. 1999) (defining unjust enrichment as "the unjust retention of a benefit *to the loss of another*, or the retention of *money or property of another* against the fundamental principles of justice or equity and good conscience") (emphasis added); *Jackson*, 741 A.2d at 393 (same).

material nonpublic information, and thus clearly sounds in fraud. (Compl. ¶¶ 26-27, 39, 42; Tontine Br. at 17); *see also In re Maxim Integrated Prods., Inc. Derivative Litig.*, 574 F. Supp. 2d 1046, 1070 (N.D. Cal. 2008) ("insider trading is a claim that sounds in fraud").

Yet the Opposition does not even attempt to argue that the Complaint sets forth particularized facts indicating that Tontine knew of the impairment charge at the time of the Offering. That failing is also fatal. (*See* Tontine Br. at 17-19). Moreover, the indisputable fact that "Broadwind itself also sold shares in the Offering" is anything but "irrelevant to the Court's analysis." (Pl. Br. at 5-6). As Plaintiffs would have it, not only is Broadwind permitted to retain the $54 million in proceeds it received from an allegedly tainted public offering, it is also entitled to a roughly $40 million windfall in the form of the alleged "illicit gains" generated by Tontine's and Mr. Drecoll's stock sales as well. Plaintiffs do not, and cannot, explain how "the fundamental principles of equity and good conscience" (*id.* at 29) require that absurd result.

## CONCLUSION

The claims against Tontine should be dismissed with prejudice.

Dated: December 9, 2011	Respectfully submitted,

/s/ Gary Stein

Gary Stein
Michael G. Cutini
David J. Lubitz
SCHULTE ROTH & ZABEL LLP
919 Third Avenue
New York, New York 10022
(212) 756-2000

John C. Martin
LAW OFFICES OF JOHN C. MARTIN, LLC
30 N. LaSalle St., Suite 3400
Chicago, Illinois 60602
(312) 368-9000

*Attorneys for the Tontine Defendants*

**CERTIFICATE OF SERVICE**

    I, Gary Stein, one of the attorneys for the Tontine Defendants hereby certify that on December 9, 2011, service of the foregoing Reply Memorandum was accomplished pursuant to ECF as to Filing Users and in compliance with L.R. 5.5 as to any party who is not a Filing User or represented by a Filing User.

**/s/ Gary Stein**

Gary Stein